[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 12, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-10215

_____

D.C. Docket No. 97-00022-CV

EDDIE ALBERT CRAWFORD,

Petitioner-Appellant,

versus

FREDERICK HEAD, Warden,
Georgia Diagnostic Prison,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(November 12, 2002)

Before TJOFLAT, ANDERSON and MARCUS, Circuit Judges.

ANDERSON, Circuit Judge:

Petitioner Eddie Albert Crawford was convicted and sentenced to death for the murder of Leslie English by the Georgia state courts in 1987. After the completion of his direct appeal and state habeas court proceedings, Crawford filed a petition for habeas corpus in the district court, pursuant to 28 U.S.C. § 2254, challenging his conviction and death sentence on a number of grounds. The district court denied the petition, but granted a certificate of appealability as to Crawford's claims that he received ineffective assistance of counsel both during the guilt-innocence phase of his trial and during the penalty phase. We granted Crawford a certificate of appealability as to his claim that the prosecution failed to disclose to him exculpatory evidence, in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), and as to his claim of juror misconduct. For the reasons discussed below, we conclude that Crawford is not entitled to relief from his conviction or sentence, and we affirm the district court's denial of his habeas petition.

## I. BACKGROUND

### A. Facts

Eddie Albert Crawford was convicted for the murder of his 29-month-old niece, Leslie English. The Georgia Supreme Court summarized the evidence related to this murder as follows:

The evidence at trial showed that the victim and the victim's mother, Wanda English, resided with Mrs. English's parents. The defendant was married to, but estranged from, one of Mrs. English's sisters at the time of the victim's death. At approximately 11:00 p.m. Saturday, September 24, 1983, Mrs. English readied the victim for bed. The defendant arrived at the victim's residence and asked Mrs. English to accompany him to a liquor store. Mrs. English agreed. The defendant was intoxicated and, enroute from the liquor store, made an unsuccessful attempt to purchase marijuana. The two returned to Mrs. English's residence where the defendant asked Mrs. English to spend the night with him. When she refused, the defendant left.

Mrs. English encountered the defendant later that same night at the house of another of her sisters. During this visit the defendant kicked an ashtray off a table which struck Mrs. English. As Mrs. English picked up the ashtray's contents, the defendant "grabbed her and pushed her." Mrs. English yelled that she would not allow him to treat her like that, then threw the ashtray at him. As Mrs. English left her sister's home, the defendant swore and called to her, "I'll fix you."

During this time the victim was in the care of Mrs. English's father, Raymond Fuller. Mr. Fuller testified that before he went to bed at 3:00 a.m., he observed the victim sleeping and pulled the bedclothes about her. Mr. Fuller testified he returned to his own bed and fell asleep. He stated that "sometime later" he was awakened by the defendant walking through the house with a lighted cigarette lighter. Mr. Fuller saw the defendant walking through the victim's bedroom in the direction of the bathroom. As the defendant was a family member and frequent guest in his home, Mr. Fuller did not consider this unusual. Mr. Fuller testified he again fell asleep and did not wake up until 5:00 a.m. when Wanda English returned home and discovered the victim missing.

Charles Durham, who lives in a house adjacent to the Fullers, testified that between 3:45 a.m. and 4:00 a.m., he observed the defendant drive up to the Fuller home and exit his car, leaving the car headlights on and the motor running. Mr. Durham testified that "about five minutes later" he noticed the defendant's car drive away.

3

When Wanda English could not locate the victim upon her return home at 5:00 a.m., she initiated a search throughout the neighborhood. She observed the defendant in his car, parked with the motor running, in front of a neighboring house, and asked if he had seen the victim. The defendant replied that he had not. Later, when the victim's grandfather asked the defendant if he knew where the victim could be found, the defendant replied "Randy [the victim's father] done it."

In the following days the defendant gave three inconsistent stories concerning where he had been between the hours of 3:00 a.m. and 5:00 a.m. on September 25. When interviewed by law enforcement officers on September 27, 1983, the defendant stated that he could remember speaking to the victim's grandfather before the victim's disappearance, but he remembered nothing more of what took place at the Fuller residence. The defendant told police that he remembered driving his car, with the victim in his lap, and trying to wake up the victim, "but she would not talk to [him.]" The defendant stated he believed the victim was "mad" because she would not respond to him. The defendant stated he stopped his car and walked "on pavement" with the victim in his arms. The defendant stated he remembered getting back into his car without the victim, but did not remember anything that had occurred in the interim.

The victim's body, clothed only in a pajama top, was discovered in a wooded area on September 26, 1983. An autopsy revealed the victim died as a result of asphyxiation. The victim had sustained a number of bruises and cuts about the left side of her face. There was a tear in the victim's vaginal opening. Based on the size and shape of the tear, the pathologist who performed the autopsy opined that it had been made by "an object more consistent with a penis than other objects." The pathologist stated his opinion that death occurred at approximately 4:30 a.m. on September 25, 1983.

Crawford v. State, 330 S.E.2d 567, 568-69 (Ga. 1985) (footnote omitted).

Considerable hair and fiber evidence was found on the victim, including three hairs on the victim's pajama top that were consistent with Crawford's head

4

hair, and some fibers that were consistent with fibers from Crawford's car. Also, the police recovered the tee-shirt worn by Crawford on the night of the murder, which they found stuffed behind a dresser in the house in which Crawford slept on the night of the murder. The shirt had blood on it, although the blood could not be typed conclusively. In addition, a pillow case, mattress pad, and bed sheet were recovered on the edge of the road not far from the body of the victim, and Crawford's wife identified these items as coming from their trailer. This bedding also had hairs consistent with Crawford and the victim, as well as fibers consistent with the carpet in Crawford's car. Type O blood, the type shared by the victim and Crawford, was found on the bed sheet.

B. Procedural History

Crawford was originally tried and convicted of murder on March 7, 1984. At the sentencing phase of that trial, the jury found as a statutory aggravating circumstance that the murder was committed during the commission of the felony of child molestation. On direct appeal, the Georgia Supreme Court reversed the conviction because it found that the verdict was ambiguous, in light of the judge's jury charge, concerning whether the jury convicted Crawford of malice murder or of felony murder. Id. at 570-71. Because Crawford had not been indicted for felony murder, the court concluded that the conviction could not stand. Id. The

5

court noted that there was sufficient evidence to support a guilty verdict either for malice murder or felony murder, so Crawford could be re-indicted and retried. Id. at 571.

After the State re-indicted Crawford, he sought to prevent the State from seeking the death penalty, arguing double jeopardy grounds. On interlocutory appeal, the Georgia Supreme Court rejected this challenge, Crawford v. State, 344 S.E.2d 215 (1986), and the U.S. Supreme Court denied Crawford's cert petition, Crawford v. Georgia, 479 U.S. 989, 107 S. Ct. 583 (1986). His case then proceeded to trial in January 1987, and he was convicted of felony murder. The jury found three aggravating circumstances and again recommended that Crawford be sentenced to death. On direct appeal, the Georgia Supreme Court affirmed the conviction and sentence, Crawford v. State, 362 S.E.2d 201 (Ga. 1987), and the United States Supreme Court denied Crawford's petition for certiorari, Crawford v. Georgia, 489 U.S. 1040, 109 S. Ct. 1098, reh'g denied, 490 U.S. 1042, 109 S. Ct. 1946 (1989).

Next, Crawford sought state habeas relief from his conviction and sentence, filing a petition on August 20, 1990. Crawford amended this petition around July 31, 1992, and received an evidentiary hearing on the amended petition on July 31, 1992. On May 21, 1993, the state habeas court denied Crawford any relief. The

Georgia Supreme Court subsequently denied Crawford's application for a certificate of probable cause on November 24, 1993, and the United States Supreme Court again denied his petition for certiorari on April 24, 1995, Crawford v. Zant, 514 U.S. 1082, 115 S. Ct. 1792, reh'g denied, 515 U.S. 1137, 115 S. Ct. 2570 (1995).

Crawford filed his § 2254 habeas petition in the district court on April 23, 1997. The district court conducted an evidentiary hearing on March 31, 1999, and then dismissed several of Crawford's claims based on exhaustion and procedural default grounds in orders issued on May 6, 1999 and May 19, 1999. After additional briefing on the remaining claims, the district court denied the petition for habeas relief on February 22, 2000, and amended its order on March 2, 2000. On December 7, 2000, the district court denied Crawford's motion to alter and amend the judgment.

On January 8, 2001, Crawford filed a timely notice of appeal and application for certificate of appealability ("COA"). The district court granted a COA with respect to Crawford's ineffective assistance of counsel claims, and we granted an order expanding the COA to include Crawford's Brady claim and his juror misconduct claim.

## II. ISSUES

1. Whether Crawford is entitled to relief based on his claim that he received ineffective assistance of counsel during either the guilt-innocence phase or the penalty phase of his trial.

2. Whether Crawford is entitled to relief based on his claim that exculpatory Brady evidence was not provided to him by the prosecution.

3. Whether Crawford is entitled to relief based on the alleged juror misconduct.

## III. STANDARD OF REVIEW

When reviewing a district court's judgment in a habeas case, "we traditionally review the district court's findings of fact for clear error and its legal conclusions and mixed questions of law and fact de novo." Robinson v. Moore, 300 F.3d 1320, 1342 (11th Cir. 2002) (quoting Fugate v. Head, 261 F.3d 1206, 1215 (11th Cir. 2001)). In cases such as this one that challenge, pursuant to 28 U.S.C. §2254, a petitioner's conviction or sentence in the state courts, and that are subject to the provisions of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, both the district court's review and our review is greatly circumscribed and is highly deferential to the state courts. See Williams v. Taylor, 529 U.S. 362, 402-13, 120 S. Ct. 1495, 1518-23 (2000). We recently explained the standards applicable to our review under these circumstances,

stating:

> First, § 2254(e)(1) provides for a highly deferential standard of review for factual determinations made by a state court: "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1).
>
> Second, § 2254(d) allows federal habeas relief for a claim adjudicated on the merits in state court only where that adjudication in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).
>
> Section 2254(d)(1) 'places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court' by requiring satisfaction of one of two conditions for issuance of the writ. As the Supreme Court recently put it, AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, ___ U.S. ___, 122 S. Ct. 1843, 1849, 152 L. Ed.2d 914 (2002) (citing Williams, 529 U.S. at 403- 04, 120 S. Ct. 1495).

Robinson, 300 F.3d at 1343-43 (citations and quotations omitted).

## IV. DISCUSSION

A. Ineffective Assistance of Counsel Claims

Crawford maintains that he is entitled to relief from his conviction and/or his

death sentence because he received ineffective assistance of counsel during both

the guilt-innocence phase and the penalty phase of his trial, contrary to the Sixth Amendment to the Constitution. The state habeas court concluded that all of Crawford's ineffective assistance claims were without merit, and now we must consider whether that decision was contrary to, or was an unreasonable application of, clearly established federal law as set out in Supreme Court precedent, or whether the state habeas court's conclusions "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d). In performing this review, we must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and Crawford bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

For the reasons explained below, we conclude that the state court's decision with respect to Crawford's claim of ineffective assistance during the guilt-innocence phase of trial does not fall outside of the range of decisions to which we must defer under these standards, and Crawford consequently is not entitled to relief on that claim. With respect to Crawford's penalty phase claim, we conclude that Crawford has failed to establish prejudice in support of his claim. Therefore, Crawford is not entitled to relief with respect to either of his ineffective assistance

10

of counsel claims.

1. The <u>Strickland</u> Standard

In order to begin our review of Crawford's ineffective assistance of counsel claims, we must determine what the clearly established federal law as set out in Supreme Court decisions was as of the time that the state courts reviewed Crawford's claims. <u>See</u> <u>Robinson</u>, 300 F.3d at 1342-43. The familiar legal standards applicable to such claims derive from the Supreme Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984). <u>See</u> <u>Williams</u>, 529 U.S. at 390-91, 120 S. Ct. at 1511-12 (concluding that <u>Strickland</u> provided standards that were clearly established federal law applicable to ineffective assistance of counsel claims). In <u>Fugate</u>, we summarized these well-worn standards as follows:

> To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show (1) that "counsel's performance was deficient" because it "fell below an objective standard of reasonableness," <u>Strickland</u>, 466 U.S. at 687, 688, 104 S. Ct. 2052, and (2) that "the deficient performance prejudiced the defense," <u>id.</u> at 687, 104 S. Ct. 2052. In a capital case, the two-prong <u>Strickland</u> analysis is applied at both the guilt and penalty phases. <u>Mincey v. Head</u>, 206 F.3d 1106, 1142 (11th Cir.2000) (quoting <u>Strickland,</u> 466 U.S. at 686-87, 104 S. Ct. 2052).
>
> Counsel's performance is entitled to "highly deferential" judicial scrutiny, and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the

11

presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S. Ct. 2052 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)). This presumption is even stronger when the reviewing court is examining the performance of an experienced trial counsel. See Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir.2000) (en banc), cert. denied, 531 U.S. 1204, 121 S. Ct. 1217, 149 L. Ed.2d 129 (2001).

In this case, the state habeas court acknowledged that ineffective assistance of counsel claims are governed by Strickland and that the petitioner was required to show both ineffectiveness and prejudice. To analyze the prejudice prong, a court must "evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – in reweighing it against the evidence in aggravation." Williams, 529 U.S. at 397-98, 120 S. Ct. 1495 (citing Clemons v. Mississippi, 494 U.S. 738, 751-52, 110 S. Ct. 1441, 108 L. Ed.2d 725 (1990)).

"Given the strong presumption in favor of competence, the petitioner's burden of persuasion – though the presumption is not insurmountable – is a heavy one." Chandler, 218 F.3d at 1314 (footnote and citations omitted). In order to show that counsel's performance was unreasonable, the petitioner "must establish that no competent counsel would have taken the action that his counsel did take." Id. at 1315 (footnote and citation omitted).

"No absolute rules dictate what is reasonable performance for lawyers." Id. at 1317 (citing Strickland, 466 U.S. at 688-89, 104 S. Ct. 2052). Thus, courts refrain from establishing rigid requirements for trial counsel's performance. For example, there is no absolute duty to investigate particular facts or a certain line of defense, although a complete failure to investigate may constitute deficient performance of counsel in certain circumstances. See id.; Housel v. Head, 238 F.3d 1289, 1294 (11th Cir.2001) ("A failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into the defendant's past or present behavior or life history.").

12

Likewise, "[n]o absolute duty exists to introduce mitigating or character evidence." Chandler, 218 F.3d at 1319. This court and the Supreme Court have held repeatedly that the performance of counsel who fails to present any mitigating evidence whatsoever – even when such evidence was available – may nonetheless pass constitutional muster. See id. (citing Burger v. Kemp, 483 U.S. 776, 794-96, 107 S. Ct. 3114, 97 L. Ed.2d 638 (1987); Darden v. Wainwright, 477 U.S. 168, 182-84, 106 S. Ct. 2464, 91 L. Ed.2d 144 (1986); Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir.1995) (en banc)).

Fugate, 261 F.3d at 1216-17.

Strickland also spoke to the issue of how to review the adequacy of an attorney's investigation of issues related to a case, as well as to an attorney's strategic decisions not to pursue particular issues, stating:

These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.

With these governing principles and our deferential review under AEDPA in mind, we now turn to Crawford's claims that he received ineffective assistance

13

of counsel, both during the guilt-innocence and penalty phases of his trial.

2. The Facts Concerning Crawford's Representation

In order to address Crawford's ineffective assistance of counsel claims, it is necessary that we first recount in some depth the facts concerning his representation. As a backdrop to considering the reasonableness of Crawford's attorney's approach to this case, we note that it is important to keep in mind that this was not the first time that Crawford was tried for the crime of which he was convicted. Instead, as mentioned above, Crawford was convicted previously, only to have the Georgia Supreme Court reverse the conviction based on ambiguity concerning the jury charge and the form of the jury's verdict. See Crawford v. State, 330 S.E.2d 567 (Ga. 1985). Therefore, Crawford's counsel had the benefit of the transcript from the first trial in preparing for the retrial.

Prior to the retrial, Crawford chose to retain new counsel to represent him. In the summer of 1985, Crawford's family retained August F. Siemon, III, an attorney who had been actively practicing criminal law for over 10 years at the time of Crawford's trial and who had substantial prior experience in death penalty cases, to represent Crawford in the retrial. The family agreed to pay Siemon $5000 in order for him to handle the trial. According to Siemon's testimony during the state habeas proceedings, discussed more below, he read the entire

14

transcript from Crawford's trial around the time that he began representing Crawford.

After Siemon filed his notice of appearance on July 31, 1985, Crawford's two attorneys from his first trial filed motions to withdraw as counsel, and the court permitted them to do so. Next, Siemon filed a motion with the trial court to preclude the prosecution from seeking the death penalty against Crawford on double jeopardy grounds. During a hearing on November 15, 1985, the trial court denied the motion. At that time, Siemon informed the court that Crawford intended to appeal the ruling concerning the double jeopardy motion, and that he would file a motion for appointment of counsel on appeal, as well as a motion to proceed in forma pauperis.

At a hearing on December 6, 1985, the trial court took up the issue of whether Crawford was entitled to proceed in forma pauperis, as well as the motion for appointment of appellate counsel. Siemon stated during that hearing that it was his hope that, despite the fact that he had been retained by Crawford, the court would appoint additional counsel to assist in the defense – preferably one of the attorneys from Crawford's first trial who was already familiar with the case. The trial court ruled that Crawford was not entitled to have additional counsel appointed to assist in the interlocutory appeal concerning the double jeopardy issue

because Siemon was capable of handling it on his own. Siemon attempted to present additional evidence concerning his need for appointed co-counsel, but the trial court found that the proffer was irrelevant given that the only motion that it was considering was the motion for appointment of counsel to assist in the appeal. Nonetheless, following the hearing the trial court entered written orders denying both the motion for appointment of appellate counsel and the motion to proceed in forma pauperis.

Following the December 1985 hearing, Crawford proceeded with his interlocutory appeal concerning the double jeopardy issue, to no avail. That appeal worked its way through the appellate courts for most of 1986, returning to the trial court in July 1986. Then, on October 27, 1986, the trial court entered its second scheduling order in the case (the first having been filed before the interlocutory appeal), setting December 8, 1986 as the date for Crawford's arraignment, and stating that pre-trial motions would be handled during the week of December 8, 1986. The order also stated that the trial would commence on January 12, 1987. After being notified of a scheduling conflict, the trial court subsequently re-scheduled the arraignment and pre-trial motion deadline for January 12, 1987, and re-scheduled the beginning of trial for January 26, 1987.

On January 12, 1987, Siemon appeared before the trial court and filed two

motions – one challenging the array of the grand and petit juries and one requesting funds to assist the defense and an ex parte hearing related to the funds request. In the latter motion, Crawford requested funds to pay for an additional attorney, scientific experts to challenge the prosecution's scientific evidence, an investigator, a challenge to the jury array, a community prejudice survey in support of a motion to change venue, a challenge to the prosecution's history of using peremptory challenges in a discriminatory manner, a challenge to the prosecution's exercise of its discretion to seek the death penalty in a discriminatory manner, and a medical doctor "to present critical evidence in mitigation of punishment."

During the hearing, Siemon made clear to the court that since the time of the hearing in December 1985, the only actions he had taken with respect to Crawford's case related to the interlocutory appeal and not to trial preparation. Among other scheduling conflicts, Siemon indicated that oral arguments were scheduled for January 21, 1987 before the Georgia Supreme Court in another death penalty case, and that yet another death penalty case was scheduled to go to trial in February 1987. Therefore, Siemon requested that a hearing be set on the motion for funds, so that the defense could begin to prepare for a trial to commence at some time after the upcoming proceedings in his other cases. The court rejected this suggestion, however, and indicated that it intended to proceed on both motions

"within the hour," although it relented somewhat and set the motion challenging the jury array for a hearing at 10 o'clock the following morning.

In response, Siemon indicated to the trial court that if he were forced to go along with the court's schedule, he would not be prepared and would be unable to provide effective assistance to Crawford. He requested at least 3-4 days to prepare for a hearing on his motion for funds and for an ex parte hearing, with a hearing on the motion challenging the jury array to be held at some time after that. The court denied the request for an ex parte hearing, and stated that the hearing on the motion for funds would proceed after a 15 minute recess. At that time, Siemon refused to provide the court with specific arguments supporting the particular funds requests because he argued that doing so would reveal his trial strategies to the prosecution. In response, the court granted Siemon $1,000 "initially" to be used by "any of the experts enumerated in the motion." At the conclusion of the January 12 hearing, the court arraigned Crawford.

On the following day, the court took up the motion challenging the jury array. Siemon again notified the court he was unprepared and needed more time and resources. In response to a question from the court, Siemon confirmed that he had done no investigation or preparation prior to filing the motion on the previous day. Siemon also indicated that he would be meeting for the first time later that

18

afternoon with an investigator who would assist in preparing for the trial. The court then proceeded with the hearing on the jury challenge, although the court agreed to continue the hearing until January 19 in order to give Siemon more time to prepare.

At the January 19 hearing, Siemon presented evidence in support of Crawford's challenge to the jury array, but he again indicated that he needed more time and money. Siemon stated that the initial "$1,000 has essentially been used up in getting us as far as we've gone now," and again requested additional funds. The court expressed frustration with Siemon's lack of preparation, and declined to grant additional funds at that time. The court indicated, however, that if Siemon used up the first $1,000 and presented evidence of a need for additional funds, it would consider granting more funds.

The following Monday, January 26, 1987, the case proceeded to trial. On that day, Crawford filed a motion for a continuance, and a motion for funds. In support of the motions, Siemon filed an affidavit stating that a review of the record showed that "expert scientific assistance was critical to the defense," in particular with respect to "critical serological evidence" that would be introduced. Siemon also stated that "a medical doctor, expert in the field of the effects of long term alcohol abuse on short term memory is critically important to the defense to

19

present exculpatory and mitigating evidence." Finally, the affidavit stated: "Due to the impossibly short time between the initial unified appeal hearing and the trial, investigative assistance is required in order to talk to all possible defense and mitigating witnesses."

The trial court indicated that it would withhold a ruling on the motions for continuance and for funds at the time that they were filed. The court then began the voir dire process, which lasted several days and only came to an end on Tuesday, February 3, 1987. After the jury was selected, the court returned to Crawford's motions for a continuance and for funds. At that time, and just before the parties made their opening statements to the jury, the court agreed that Crawford was entitled to an ex parte hearing concerning his need for funds.

During the ex parte hearing, Siemon argued to the court, based primarily on the evidence introduced at Crawford's first trial, that he needed funds to obtain pathology and serological experts to challenge the prosecution's witnesses and evidence, and that he needed a doctor to testify concerning the effects of Crawford's long-term abuse of alcohol. In particular, Siemon stated:

> There was a great deal of testimony in the last trial as to the fact that
> Mr. Crawford was drinking and drinking fairly heavily on the day that
> this occurred. It has been, and it's a product of my investigation in
> this case, I believe it's established facts, that if a medical doctor, a
> doctor who had some expertise on the subject of alcoholism and the
> treatment of alcoholics and the symptoms of alcoholism were to talk

to Mr. Crawford, and Mr. Crawford were to reveal to him what he's revealed to me, which basically is that since he got back from his service in Vietnam that he has been a regular, daily, heavy drinker; that a doctor that was presented with this history on Mr. Crawford's part would testify that his version of what happened that night, basically, that he woke up and that there are gaps in what he can remember and what he can't remember, that he found a little girl in the back of the car and panicked, that his account of what happened had some basis – has some basis in the symptomology of alcoholics; that they drink, that when they drink too much, they tend to have blackouts, that sometimes they do things or they take actions that they don't recall; and just generally give testimony that would support his version of what occurred that night. As far as that goes – you know, that goes – that testimony would go to the guilt or innocence. It would also go to . . . mitigating type of testimony that would got to the issue of punishment.

Siemon stated on a couple of occasions that he felt that he was adequately prepared to handle the guilt-innocence phase of the case (except for his need to obtain the experts he was seeking), but that he was unprepared to handle any penalty phase. He stated:

> I feel fairly comfortable at this point with what we might introduce – or being able to cross-examine the State's witnesses. I also feel fairly comfortable at this point, considering that I don't have any – I don't have any scientific witnesses, but I feel fairly comfortable with being able to put up a case in the guilt or innocence phase of the trial, depending on what – depending on whether or not something unexpected comes up. If the trial goes essentially the way it did last time, we shouldn't have much of a problem – many problems there. The problem is the penalty phase. It would be my intention, and this clearly is one of the reasons why we've got to have an ex parte hearing on this type of thing – but it would be my intention to – if this case goes as far as penalty, to put up people from Mr. Crawford's family, to talk about his personality and how his personality may have

21

changed since he returned from Vietnam, also, expert testimony on the effects of alcoholism and how that might mitigate – or what his state of mind might have been, if in fact – if we assume that he's committed the crime, which for the purpose of the sentencing hearing I would do, if he had been convicted. And additionally, there is at least one witness who I have not been able to locate who served with Mr. Crawford in Vietnam. . . . We were finally able to locate where he was, and he served in the Marines with Mr. Crawford in Vietnam; and he is a potential witness . . . But the long and short of it is, is that I feel like that, at this point, that the investigation is fairly complete. . . . But this is – the investigation is ongoing, and I feel comfortable with it, except as it applies to the penalty phase. And basically what I've got in the penalty phase is – at this point, is just his family. . . . I would expect them to testify . . . that there was a change in his personality when he got back from Vietnam and he started drinking heavily, and it was at that point that he began – that he had the other run-ins with the law that he's had . . . And we would want to attribute or make an attempt to attribute . . . those instances when he's committed an illegal act to his alcoholism, and we would need some supporting testimony from an expert.

Following this statement, the court modified its previous order concerning the motion for funds and agreed to pay for the witness to travel from Virginia to testify concerning Crawford's military experience and to provide Crawford with "another $1,000 right now."

After the ex parte hearing, but before opening statements, the record reflects that Siemon moved the trial court to either grant a continuance or to proceed "in half day rather than full day increments," but the court denied that request. The parties then proceeded to deliver their opening statements.

a. Facts: Representation During the Guilt-Innocence Phase of Trial

22

In his opening statement, Siemon suggested to the jury that many of the witnesses that the prosecution would rely on would not be reliable, in part because many of them were drinking heavily on the day of the murder. He also stated that the State's case was really based on statements made to the police by Crawford, rather than on any substantial scientific evidence, as the prosecutor's opening statement had suggested. Siemon stated that he expected to show that the police investigation was inadequate and focused too quickly on Crawford, to the exclusion of other suspects. Finally, he stated that Crawford was an alcoholic who was prone to blackouts and who had been drinking heavily on the day of the crime, and that Crawford's statements then resulted from police pressure on his "unstable personality."

Next, the prosecution proceeded to present its case, starting with the testimony of Wanda English, the mother of the victim, Leslie English. English provided her account of the events of the evening on which the crime occurred. She testified that Crawford asked her to spend the night with him in his trailer, and that he became angry after she refused. She also described discovering that Leslie English was missing, and her attempts to search for her. Siemon asked no questions of this witness.

The next important witness for the prosecution was Raymond Fuller, the

grandfather of the victim, who was present at the house on the night that Leslie English was killed and who testified that he saw Crawford walking though the house with a lighter in the middle of the night before the victim was found to be missing. On cross-examination, Siemon attempted to show that Fuller had more to drink on the night of the murder than he was willing to admit (he also attempted to show this by cross-examining other witnesses about how much Fuller had to drink that night). Siemon also brought out inconsistencies between Fuller's testimony on direct examination and his testimony during the preliminary hearing and first trial. During direct examination, Fuller testified that he got up at 3:00 a.m. to turn out the lights, and saw that the victim was still safe and in bed. He further testified that it was after that time that Crawford walked through the house flicking a lighter. However, as Siemon brought out, Fuller had testified during the first trial that he could not identify  as Leslie English the person he saw in the bed when he turned off the light. He also had testified that he saw Crawford walking through the house with the lighter prior to getting up to turn off the light, rather than after that time.

A subsequent witness, Charles Durham, who lived across the street from the house from which the victim was taken, testified that when Durham got up to use the restroom sometime after 3:25 a.m., he saw Crawford's car pull up into the yard of that house. He testified that he saw Crawford get out of the car and go in the

24

house, and then, while Durham was returning from the restroom, he saw Crawford's car pull out of the yard and leave.  On cross-examination, Siemon impeached Durham with previous testimony during which he had said that he could not positively identify as Crawford  the person he saw in the neighboring yard, and that he could not be sure that the car he saw belonged to Crawford.

When cross-examining Danny Turner, a twelve-year-old who was present at the house on the night of the murder and who interacted with Crawford that night, Siemon again pointed out changes in the witness's testimony which changes made the testimony more incriminating to Crawford.   Siemon also got the witness to admit that the family talked about the events of that evening a lot, thereby suggesting that the family had tailored their testimony to help convict Crawford.

The next important witness was Gordon Brown, Sr., who testified that he heard Crawford threaten the victim's mother on the night of the murder, and found Crawford sleeping on his couch the following morning.[1]  He stated that Crawford originally said he slept on Brown's couch all night, but changed his story after Brown told him that he had been up several times during the night and knew that

---

[1]Brown died between the time of Crawford's first and second trials, so his testimony from the first trial was read to the jury.  Because of this, however, Crawford's previous attorneys, rather than Siemon, actually performed the cross-examination of Brown.

Crawford was not there. On cross-examination, Crawford's counsel established that Crawford was drunk on the evening of the crime, and also that Brown had himself been accused of child molestation.

After Brown's daughter testified that she found Crawford's shirt, with a blood stain on it, hidden in her house a couple of days after the crime, Siemon established through cross-examination that she had lied to the police about her whereabouts on the night of the crime.

Crawford's wife, Jackie Crawford, testified concerning the evening of the crime, and also identified a sheet, pillowcase and mattress cover that were found near the victim's body as coming from the trailer she lived in with Crawford. The witness also testified that she saw Crawford take a pair of socks out of his car in the days following the crime and throw them away across the street from their trailer. On cross-examination, Siemon established that she was with another man on the night of the crime, and that she too had lied to the police about where she had been.

The prosecution next moved to its witnesses who conducted the investigation into the murder of Leslie English. The chief investigator, Daniel Green, testified concerning the crime scene, the hair and fiber evidence found on the victim, the autopsy, and the first interview of Crawford. It was during that

interview that Crawford claimed to have spent the night of the murder at Brown's house – a story he changed during subsequent interviews. Green also testified concerning the sheet, mattress pad, and pillowcase, previously identified as coming from Crawford's trailer, that were found on the side of the road between Crawford's trailer and the house from which Leslie English was taken. During the cross-examination, Siemon pointed out that Crawford's statement to Green was consistent with his having blacked out, but that the police did not pursue that issue. Siemon also attacked the adequacy of the investigation, in light of the fact that several individuals in close proximity to the house from which the victim was taken and who had access to that house had previously been accused of child molestation, but the police chose to focus on Crawford rather than investigating those individuals further.

Next, Officer Paul Muscik testified primarily about his interviews of Crawford during which Crawford provided very incriminating statements. Muscik testified that Crawford said he had a recollection of driving with Leslie English in his lap and of shaking her but being unable to wake her. Muscik also described several other statements by Crawford which implicated him in the crime, such as Crawford's request to use Muscik's service revolver to kill himself after being informed that Leslie English had been raped. Siemon's cross-examination of

27

Muscik focused on the fact that Crawford consistently denied having molested or killed Leslie English, as well as the fact that Crawford's statements reflected that he had periods of blackouts.

The prosecution next put up witnesses from the Georgia Bureau of Investigation Crime Lab to testify concerning the evidence in the case. Larry Peterson testified concerning the types of analysis performed on hair and fiber evidence that was recovered. He stated that he tested known head, pubic and arm hair samples taken from Crawford, as well as hair samples from Leslie English. He also stated that he tested fiber samples taken from Crawford's car. Given these samples, Peterson testified that he was able to determine that several hairs taken from the victim's body and pajama top were consistent with the head and pubic hair of Crawford, and that fiber samples taken from the same sources were consistent with Crawford's car. Peterson further testified that the bedding which was recovered from beside the road contained hairs that were consistent with the victim's hair as well as Crawford's head and pubic hair. The mattress cover additionally had a fiber consistent with Crawford's car. He also stated that the socks that Crawford's wife saw him take out of his car and dispose of had hairs consistent with Crawford's head and pubic hair and with fibers from his car. Finally, Peterson testified that a hair consistent with Crawford's arm hair was

28

found inside the victim's vaginal cavity, although this particular evidence was later

excluded after Siemon established a chain-of-custody problem.

Siemon's cross-examination of Peterson largely focused on the limitations on hair and fiber testing, and on the fact that this testing only permitted conclusions that certain hairs or fibers were consistent, but not whether they actually came from the same source. Peterson also testified that hairs and fibers could be transferred from one place to another, and that it was not possible to determine when various hairs or fibers were picked Therefore, Siemon got Peterson to admit that the hair and fiber evidence could only establish that the victim had some contact with "the car or person of Eddie Crawford."

Next, Linda Tilman, a serologist employed at the Crime Lab, testified that both Leslie English and Crawford had type O blood, and that type O blood was found on both the sheet and pillowcase found beside the road. Tilman also testified that blood was found on Crawford's shirt, although she did not testify as to the blood type of that blood. She further testified that although the shirt, sheet, and pajama tops were packaged separately, they all shared the same distinctive odor. Siemon asked no questions of Tilman.

The State's final witness was Dr. James Dawson, who performed the autopsy on Leslie English. Dawson testified that the victim had injuries to her head that were consistent with being struck by a human hand. Dawson also testified that the victim's vaginal canal was torn, an injury consistent with an

30

attempt to insert an adult penis. Dawson testified that the victim died as a result of asphyxiation. On cross-examination, Siemon's only question concerned the fact that just because the victim's injuries to her head were consistent with being hit by an adult hand, the doctor had no knowledge of what actually happened.

After the State rested its case, Siemon indicated that Crawford would also rest his case without calling any witnesses. Siemon indicated that before doing so, however, he would like to make a motion for a continuance, again based on the lack of funds and his inability to obtain the service of experts. The court denied the motion for a continuance.

The prosecution's closing argument recounted all of the incriminating evidence against Crawford. Siemon raised no objections to the argument, even though the prosecutor argued that Crawford's pubic hair was found in the victim's vaginal canal. The evidence related to this point was that an arm hair was found in the vaginal canal, and that evidence was subsequently excluded because the State failed to establish the proper chain of custody. Siemon also did not object to the prosecutor's argument that Type O blood, consistent with the victim, was found on Crawford's shirt, even though the evidence at trial was only that blood was found on the shirt.

31

Siemon's closing argument largely focused on the credibility issues concerning the prosecution's witnesses, and Siemon's impeachment of the witnesses during cross-examination. In particular, Siemon focused on how the witnesses' testimony had changed since the preliminary hearing and first trial. Siemon also pointed to the testimony of Danny Turner to the effect that the family talked about the case a lot, and argued that the family had tailored their testimony to make it more incriminating to Crawford. Siemon also argued to the jury that the police investigation was inadequate and that they failed to investigate other individuals with access to the house who had previously had child molestation allegations leveled against them. He also argued that the state's hair and fiber evidence did not prove anything, and that they only corroborated Crawford's statements to the police, but did not show who killed the victim or how or when she died.

Siemon argued that Crawford was an alcoholic who had blackouts on the night of the crime, and that he was mentally unstable at the time of the crime. He argued that these facts undermine the significance of the statements that Crawford gave to the police, and made him more amenable to suggestion. Finally, Siemon argued that the State had provided no evidence of motive on Crawford's part.

After the jury was charged and while it was deliberating, Siemon again

raised his objection related to the lack of funds and time to prepare the witnesses that he said he needed for Crawford's defense. He also indicated that if there was a penalty phase, he would need at least a few days to prepare witnesses and obtain necessary experts. The court denied the request, and noted Siemon's continuing objection. Shortly thereafter, the jury returned with a guilty verdict on the charge of felony murder, but not malice murder.

b. Facts: Representation During the Penalty Phase of Trial

The penalty phase of Crawford's trial commenced the following morning. At this phase, the only additional evidence presented by the State was proof of two felonies of which Crawford had previously been convicted.

In support of Crawford, Siemon called several of Crawford's family members to the stand. First, he called Crawford's brother, Allen Crawford, who testified about his relation to Crawford and his own family and employment, and then he asked the jury to consider the effect on his parents of a death sentence.

Siemon then called Crawford's brother-in-law, Fred Clark, who basically only testified concerning his relation to Crawford and his own background, and, when asked if he had anything to tell the jury, responded: "Just that we love him, and we'd like to continue to see him." Crawford's sister, Linda Varnum, testified next, and the totality of her testimony was that she was Crawford's sister, that she

33

grew up in the area, and that she was a school teacher. Gleaton Love, Crawford's

stepfather, testified that he and Crawford's mother regularly visited Crawford in

prison. Crawford's son, Eddie Crawford, Jr., testified that he hoped that his father

would "come out of this . . . [a]live." Finally, Crawford's mother, Margie Love,

testified. Her testimony was limited to stating that she was Crawford's mother and

that she had visited him on all but three weekends during the four years he had

been incarcerated. With that, Siemon rested Crawford's case in mitigation. The

entirety of the case in mitigation consisted of 15 pages of transcript.

In his closing argument, the prosecutor reviewed the evidence from the

guilt-innocence phase of the trial and urged the jury to find three aggravating

factors: 1) that the murder occurred during a kidnapping with bodily injury, 2) that

the murder occurred in the course of a rape, and/or 3) that the murder was

wantonly vile, horrible or inhumane, in that it involved torture, depravity of mind

or an aggravated battery to the victim. The prosecutor also characterized Crawford

as a "three-time loser" in light of his previous two felony convictions.

Siemon's closing argument focused largely of the effect on Crawford's

family if he were to be executed. Siemon began:

> Ladies and gentleman, [the prosecutor] was half right. He told you
> that I was going to come up here and ask you to have mercy on Eddie
> Crawford. He told you that I was going to ask you to give him a life

34

sentence, not give him the death penalty in this case. Well, he's half right. I'm going to ask you not to give him the death penalty in this case, to have some mercy on him, but not so much to have mercy on him but to have mercy on his family. I didn't bring these people in here to say nice things about Eddie Crawford. I wanted y'all to meet the people who are going to be impacted the most by the decision y'all are about to make. Eddie Crawford's really not in a position to ask anybody to have mercy on him except in a religious sense, in a moral sense.

After asking for mercy on Crawford's family, Siemon also pointed again to some of the inconsistencies in the witnesses' testimony and to the alleged lack of diligence by the police in investigating other suspects, and asked the jury to consider any residual doubts they might have. Siemon concluded by again asking the jury to show mercy for Crawford's family.

After the jury began its deliberations, it came back to the court with the following question: "The jury would like to know, could we fix a sentence of life imprisonment without parole." After discussing the issue with the attorneys, the court charged the jury that "you are to presume that if you sentence the Defendant to life imprisonment, that the Defendant will spend the rest of his life in prison, and you are to presume that if you sentence the Defendant to death, that he will be electrocuted until dead." After further deliberations, the jury sentenced Crawford to death. The jury found that all three aggravating factors were present.

3. The State Habeas Proceedings

35

In September 1990 and after Crawford's direct appeal was completed, Crawford filed a state habeas petition. In his petition, Crawford claimed, among other things, that he received ineffective assistance of counsel both during the guilt-innocence and penalty phases of the trial. The next activity reflected in the habeas record was a motion, filed on July 13, 1992, to allow a psychologist to have access to Crawford in order to perform testing. The state habeas court granted that order on July 16, 1992. On July 22, 1992, nine days before the habeas court evidentiary hearing scheduled for July 31, Crawford filed a motion for continuance in order to allow for additional psychological testing and additional investigation. Included as an exhibit to this motion was an initial evaluation of Crawford by David R. Price, Ph.D., the psychologist used by Crawford's habeas counsel. This evaluation indicated that Price had examined Crawford on July 20, 1992, but that additional evaluation and information was necessary, including a review of records to be obtained from the Veterans Administration ("VA"). On the day before the evidentiary hearing, Crawford filed an amended habeas petition raising additional claims and providing additional detail in support of the previously asserted claims. On that day Crawford also filed a motion to discover test results and to perform independent testing of certain evidence that had not been disclosed to the defense prior to trial, but that Crawford argued could be

exculpatory. Crawford also filed an additional motion for a continuance on July 30, 1992, accompanied by an affidavit from Price concerning his evaluation of Crawford.

At the hearing on July 31, 1992, the state habeas court denied Crawford's motion for a continuance to allow further testing, stating:

> I'll deny the motion for a continuance. This case has been pending for two years. You've had plenty of opportunity to have your evaluations done. So I will deny the motion for a continuance . . .

Afterward, Crawford put forth evidence in support of his ineffective assistance of counsel claim. Crawford submitted 13 affidavits concerning information that he alleges Siemon should have investigated and presented, both during the guilt-innocence and penalty phases of the trial. He also submitted certain military, school, and mental health treatment records on which Dr. Price relied, as well as a GBI report that Crawford argued was Brady material which had not been produced.

One of Crawford's attorneys from his first trial, Tamara Jacobs, submitted an affidavit stating that she had offered to turn over her file or to otherwise assist in any way with the retrial, but that Siemon never came to her office or reviewed the file. She stated that the only time that she was ever asked for any information was on the morning of the trial when Siemon's investigator asked her some "brief

37

questions" about the case.

Crawford also filed a more extensive affidavit submitted by Dr. Price containing his opinion based on his personal evaluation of Crawford as well as information made available to him from family members and other sources. Dr. Price's affidavit began by noting relevant aspects of Crawford's background. He stated that Crawford's father was an alcoholic and was abusive, and that his parents ultimately divorced. Dr. Price noted that Crawford quit school in the ninth grade, and then joined the Marines. While in the Marines, Crawford served in Vietnam, but his performance was erratic. Dr. Price said that after Crawford returned to the United States, he went AWOL for a period of time. Dr. Price noted that:

> Following his return from combat, Mr. Crawford appeared different to family members and close associates. He, himself describes how he felt ever since Viet Nam his life had deteriorated. His history post Viet Nam is remarkable for intrusive thoughts over death scenes he witnessed, feelings of guilt, dreams, anger, depression, increased alcohol and cannabis abuse, self destructive behaviors, inability to sustain employment, three marriages, suicidal ideation, and emotional liability.

Dr. Price noted that Crawford had significant financial problems, including unpaid child support, resulting from his alcohol abuse and failure to maintain employment, and that these problems exacerbated his mental problems. Dr. Price also noted that Crawford previously had sought mental health treatment from the Spalding County Mental Health Center and the VA, and that his family had attempted to have him

committed to the VA. Price stated that Crawford had a history of substance abuse and a "history of DUIs and black outs."

According to Price, at the time that he examined Crawford, Crawford suffered from mild depression, periodic panic attacks, and intrusive thoughts of Vietnam. Price noted that various tests that he performed revealed the possibility that the difference between Crawford's verbal and non-verbal memory may be the result of the "residual effects of chronic alcohol abuse or organic functioning differences between his cerebral hemispheres," or may only be the result of experience (i.e., non-familiarity with verbal versus non-verbal tasks). A personality test revealed that Crawford was "one of the most disturbed inmate types" and was within the group of individuals that would "tend to have a broad range of psychological disturbances" and that would be "more likely to be psychotic than other types."

Price also concluded that Crawford had "borderline personality disorder" and that he displayed all of the symptoms of post-traumatic stress disorder ("PTSD"). He noted that among the features associated with this condition are: "symptoms of depression and anxiety . . . [i]ncreased irritability may be associated with sporadic and unpredictable explosions of aggressive behavior, upon minimal or even no provocation." Price also noted that emotional liability, depression,

39

guilt, self-defeating behavior, suicidal actions, and substance abuse are associated

with PTSD. Price concluded that the disorders he detected in Crawford were

present in 1983.

Crawford's mother, Margie Love, testified, by affidavit, concerning

Crawford's background. She stated that Crawford's father was an alcoholic and a

Demerol addict, and that he routinely abused both her and the children. As a

result, she left her husband at least 16 times before finally divorcing him and

moved around with the children on several occasions. She also stated that the

family was very poor, but the father would often spend their money on alcohol and

gambling. Love testified that Crawford's personality changed dramatically as a

result of serving in Vietnam. Afterwards, Crawford was nervous and jumpy all the

time, could not sleep, and began to abuse alcohol.

Crawford's mother also provided some insight into Crawford's experiences

in Vietnam. She stated:

> Over the years Eddie has mentioned his time in Vietnam very few
> times; it always seemed a very difficult thing for his to talk about. I
> asked him one time about a small scar he had on his little finger, and
> he told me that he got it when the ammunition dump he was working
> at was bombed. He and his friend hit the ground when they heard the
> siren, but his friend looked up instead of putting his face in the dirt
> like he was supposed to. Eddie put his hand on his friend's helmet to
> get his head down, and at that moment a piece of shrapnel ripped
> through his friend's face, just nicking Eddie's finger.

40

Affidavit of Margie Love, at ¶ 17. She also said that he mentioned that someone who took his place on a particular mission was killed, and that if he had not been busy that day, it would have been him.

Crawford's two sisters and brother submitted similar affidavits concerning Crawford's unfortunate and abusive childhood, and the effect of Vietnam on his personality. Each of them said that they would have been willing to testify at Crawford's trial concerning these facts if they had been asked to do so.

Crawford's father, Ira Willard Crawford, also submitted an affidavit noting that the family was very poor when Crawford was a child, and stating that Vietnam changed Crawford's personality and made him start abusing alcohol. Likewise, Crawford's aunt stated that Crawford was a "nice, jolly teenager" before serving in Vietnam, but was a "very different person" afterwards. She stated that she was never contacted by Siemon, but would have been willing to testify.

Crawford's son, Eddie Crawford, Jr., submitted an affidavit that stated that Crawford would often disappear and would drink heavily. Crawford's ex-wife, Barbara Dinkins, submitted an affidavit that stated that Crawford was a good person before serving in Vietnam, but was a "completely different person" when he returned. He was "outspoken and loud," "irresponsible and thoughtless," and "nervous." He would disappear for periods of time, and spend all their money on

"booze and gambling."

Crawford also presented an affidavit from Stanley Nymeyer, who served in Crawford's unit in Vietnam. Nymeyer described his own horrific experiences in Vietnam, but his only statement concerning Crawford is that they were in the same unit.

Finally, two of the jurors from Crawford's trial submitted affidavits, one of which indicated that initially "[t]he jury agreed unanimously to vote for life, but wanted assurances the defendant would not be released on parole." The juror stated that the jury decided to vote in favor of the death penalty "[w]hen the judge could not provide that assurance."

In addition to these affidavits, Crawford called Siemon as a witness during the evidentiary hearing. Siemon testified he had been preoccupied with an unrelated murder case for a considerable amount of time prior to the trial in Crawford's case, and that he was only notified that of the scheduling of Crawford's arraignment and trial approximately a week ahead of time – although the record shows that the court's original, post-appeal scheduling order was issued in late October 1986 and the amended order was issued in mid-December 1986. Siemon testified that he had read the transcript of the first trial around the time that he was retained in 1985, and that his pretrial motion for funds was based on his

understanding of the case from that trial. Based on the first trial, Siemon testified that he thought the issue of Crawford's alcoholism was a "very critical issue" that had not been sufficiently developed during the first trial. Siemon thought that this issue, along with the related issue of Crawford's blackouts, would help to explain the inconsistencies in Crawford's statements to the police, as well as explain the holes in his memory from the night of the crime. However, Siemon testified that after the trial court granted Crawford the initial $1000 two weeks before trial, he decided to spend the money on an investigator to look into issues related to the jury challenge and to investigate the other people who were potential suspects in the case.

Siemon repeatedly testified during the state habeas hearing that he had insufficient time and money to adequately prepare for Crawford's trial. Specifically, Siemon testified that he had wanted to "get expert medical testimony to go into his alcoholism" and also wanted to "go into his Viet Nam background," but had been unable to do so given the time and monetary constraints.

Siemon testified that he had the opportunity to have "superficial" conversations with Crawford's family before trial, but stated that he was unaware of any history of alcoholism in the family. Siemon also stated that he did not have sufficient time to investigate Crawford's military records or records from

43

previous mental health treatments, and that he "certainly" would have pursued those lines of investigation if he had more time. He testified that he was not aware that Crawford had received mental health treatment from the VA. Siemon characterized his investigation into mitigating evidence as superficial.

On cross-examination, Siemon admitted that he had read the transcript from Crawford's first trial at least twice in preparation for the retrial – once when he was retained and again in the days before trial. He testified that the transcript gave him a good idea of what the State's case would be against Crawford. He also testified that he spoke with Crawford "[n]umerous times" before the trial – maybe more than twenty – and with several members of Crawford's family.

4. Ineffective Assistance During the Guilt-Innocence Phase

It is in light of this record that we must consider Crawford's claim that he was denied effective assistance of counsel during each of the phases of his trial. As explained above, however, given that this case is subject to the standards imposed by AEDPA, our review must begin by looking to the decisions of the state court on these issues, and then we must decide whether those decisions are entitled to deference. See 28 U.S.C. § 2254(d). We will first consider Crawford's ineffective assistance of counsel claim as it relates to the guilt-innocence phase of his trial.

44

In its order, the state habeas court rejected Crawford's argument that he received ineffective assistance of counsel during the guilt-innocence phase of his trial. In reaching this conclusion, the state court began by setting out the Strickland standard for reviewing claims of ineffectiveness. Therefore, the standard used by the court was not "contrary to" clearly established federal law as set out in the Supreme Court precedent. See Williams, 529 U.S. at 405, 120 S. Ct. at 1519.

Next, however, we must consider whether the state court's decision nonetheless was an "unreasonable application" of clearly established federal law. As to the claim that Siemon failed to adequately prepare for and present Crawford's case during the guilt-innocence phase of the trial, the habeas court stated:

> Trial counsel thoroughly read the transcript from petitioner's first trial and knew what evidence the state would be presenting at the retrial. As detailed in respondent's brief, trial counsel consulted with the attorneys in the original trial; he interviewed family members and became familiar with petitioner's background; he interviewed petitioner numerous times; he filed a challenge to the array of the grand and petit juries; he filed pre-trial motions for funds to investigate; and he prepared for trial. Trial counsel was assisted by an investigator.

> Trial counsel's theory of defense was that the state's evidence failed to exclude every other reasonable theory except for the petitioner's guilt and that petitioner's pre-trial statements were consistent with the state's evidence. This court concludes that trial counsel's

45

performance during preparation and investigation and at trial was adequate.

State Habeas Order, at p. 9-10. The court also found that Siemon was not ineffective by failing to make a better showing in support of his request for funds because Crawford "failed to persuade this court that exculpatory evidence would have been developed by the grant of additional funds."

We conclude that the state habeas court's decision in this regard was not an unreasonable application of Strickland and its progeny. As we explained above, the Sixth Amendment only entitles a criminal defendant to "reasonably effective assistance," judged against "an objective standard of reasonableness." Strickland, 466 U.S. at 687-88, 104 S. Ct. at 2064. Also, "[t]he purpose is simply to ensure that criminal defendants receive a fair trial," rather than to determine through hindsight that a defense attorney could have done a better job. Id. at 689, 104 S. Ct. 2065.

In this case, it certainly would have been preferable for Siemon to have begun his trial preparations earlier than he did, and it is also possible that he could have been more effective in developing certain lines of defense if he had done so. Whether he could have done more, however, is not the question we must answer. Instead, we must look at the representation that he provided and determine whether it was objectively reasonable, and sufficed to make Crawford's trial fair. Or more

46

accurately, in light of AEDPA, we must determine whether the state court acted unreasonably in determining that Siemon was not ineffective.

As the state habeas court mentioned, Siemon met with Crawford on numerous occasions in preparation for the trial, and he also met with members of Crawford's family to discuss the case. Siemon read the transcript of Crawford's first trial at least two times, and was consequently well aware of what the prosecution's case would entail and of the issues that were important to the defense. The record reveals that Siemon effectively cross-examined many of the witnesses, including pointing out numerous inconsistencies in the testimony of some of the witnesses, thereby undermining the weight of the testimony from some of the prosecution's most important witnesses. Furthermore, without presenting witnesses of his own, Siemon was able to bring out the issues which he identified as being important to the case – the lack of diligence on the part of the police coupled with the proximity of other potential suspects – through cross-examination. Likewise, Siemon was also able to suggest that Crawford had blacked out much of the evening of the crime.

The record further reveals that Siemon was well aware of the limitations of the scientific evidence on which the prosecution relied, and that he was able to point out those limitations to the jury. As he testified during the state habeas

proceedings, Siemon was very familiar with such evidence as a result of a previous case that he had handled. Moreover, through a chain-of-evidence argument, Siemon was able to get one of the most damning pieces of hair and fiber evidence excluded from the trial.

In addition to the issue of Siemon's performance at trial, in order to be entitled to relief Crawford would have to show that any deficient performance resulted in prejudice to him. In considering this aspect of his claim, we note that the vast majority of the evidence submitted in the state habeas corpus proceeding that Crawford argues should have been discovered and presented really relates only to issues of mitigation. Evidence related to his disadvantaged childhood, his experiences in Vietnam, and his alcoholism and related mental problems are all aimed at showing that he should not have been sentenced to death, and not at showing that he did not in fact commit the crime of which he was convicted.

Therefore, under the circumstances of this case and after a thorough review of the record, we conclude that the state habeas court did not unreasonably apply Strickland in determining that Crawford did not receive ineffective assistance of counsel during the guilt-innocence phase of his trial. Thus, we defer to the state court's decision in that regard, and Crawford is not entitled to relief from his conviction on this basis.

48

5. Ineffective Assistance During the Penalty Phase

Next we turn to the much more difficult question of whether Crawford received ineffective assistance of counsel during the penalty phase of his trial. As noted above, the state habeas court recognized that Strickland provided the controlling rule of law. The state habeas court then concluded that Siemon's investigation and presentation of Crawford's case during the penalty phase was adequate, and that Siemon's failure to obtain the services of a mental health expert did not prejudice Crawford, stating:

> Petitioner's first claim of ineffective assistance of counsel at the sentencing phase alleges that trial counsel should have presented mitigation evidence based on petitioner's traumatic experience in Vietnam, his abusive father, his alcoholism and drug use. At the sentencing phase trial counsel presented testimony from petitioner's family and urged the jury to consider the impact that a death penalty would have on petitioner's family. In pursuing this line of defense, this court finds that trial counsel performed effectively. "Deliberate choices of trial strategy and tactics are within the province of trial counsel after consultation with his client [cit]. In this regard this court will not substitute its judgment for that of trial counsel." Hudson v. State, 250 Ga. 479, 486 (8) (1983). The applicable standard is "'not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance.' [Cit.]" Hawes v. State, 240 Ga. 327, 329 (1) (1977). Accordingly, this court concludes that trial counsel did not perform deficiently in his presentation of mitigation evidence.
>
> Petitioner next contends that trial counsel was ineffective for failing to procure funds for an independent mental health expert. This court agrees that testimony from a mental health expert concerning petitioner's mental condition (post traumatic stress disorder,

49

alcoholism and drug addiction) would have been admissible and might be considered to be mitigating. However, trial counsel chose to pursue a strategy of focusing the jury's attention on the impact of a death sentence on petitioner's family. This court will not second guess trial counsel's deliberate choice. Moreover, considering the facts of this case, it is doubtful that such evidence would cause the jury to sentence petitioner to life rather than to death.

State Habeas Order, at p. 11-12. Therefore, based on its finding that Siemon deliberately chose to focus on the impact of a death sentence on Crawford's family, the court concluded that Crawford's ineffective assistance of counsel claim was without merit.

Here again, the habeas court identified the correct legal standard under the Supreme Court's precedent, so our review is limited to whether the state court unreasonably applied controlling Supreme Court precedent to the facts of this case. See 28 U.S.C. § 2254(d)(1). As we shall explain, we believe that it is a close question whether Crawford's counsel's performance was deficient during the penalty phase of the trial, but we need not decide that issue because we conclude that Crawford has not established prejudice as a result of any deficiencies.

a. The Deficient Performance Prong of the Strickland Analysis

On many occasions, this Court and the Supreme Court have been called on to assess the adequacy of a defense attorney's efforts in preparing for and presenting a defendant's penalty phase case in capital cases. As Strickland itself

50

recognized, "a capital sentencing proceeding . . . is sufficiently like a trial . . . that counsel's role in that proceeding is comparable to counsel's role at trial . . . [and] therefore, [a] capital sentencing proceeding need not to be distinguished from an ordinary trial," for purposes of assessing a claim of ineffective assistance of counsel. Strickland, 466 U.S. at 686-87, 104 S. Ct. at 2064 (citations omitted).

Of particular importance in many cases concerning counsel's preparation for and performance at capital sentencing proceedings is whether or not an attorney performed an adequate investigation. The Strickland Court noted:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690, 104 S. Ct. at 2066.

On several occasions, this Court and the Supreme Court have recognized that "[n]o absolute rules dictate what is reasonable performance for lawyers," and, accordingly, "no absolute duty exists to investigate particular facts or a certain line

51

off defense." Chandler v. United States, 218 F.3d 1305, 1317 (11th Cir. 2000) (en banc). Moreover, "[c]ounsel is not required to present every nonfrivolous defense; nor is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy." Id. at 1319 (citing Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc)). In fact, "[n]o absolute duty exists to introduce mitigating or character evidence." Id. As we noted in Waters:

> To the contrary, the Supreme Court and this Court in a number of cases have held counsel's performance to be constitutionally sufficient when no mitigating circumstance evidence at all was introduced, even though such evidence, including some relating to the defendant's mental illness or impairment, was available.

Waters, 46 F.3d at 1511 (citing Darden v. Wainwright, 477 U.S. 168, 184-87, 106 S. Ct. 2464, 2473-74 (1986)). See also Putman v. Head, 268 F.3d 1223, 1243-44 (11th Cir. 2001) (discussing standards for judging deficient performance by counsel during penalty phase of death penalty case).

Rather than laying down absolute rules that defense counsel must investigate certain things or must present certain types of evidence, "our decisions teach that whether counsel's performance is constitutionally deficient depends upon the totality of the circumstances viewed through a lens shaped by the rules and presumptions set down in Strickland v. Washington, 466 U.S. 668, 104 S. Ct.

52

2052, 80 L. Ed.2d 674 (1984), and its progeny." Waters, 46 F.3d at 1511. In applying those rules and presumptions, we must bear in mind that the "touchstone of a lawyer's performance under the Constitution" is "reasonableness." Chandler, 218 F.3d at 1319. As we have explained:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

Waters, 46 F.3d at 1512 (quoting White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir.1992)). Accordingly, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." Putman, 268 F.3d at 1244 (quoting Roe v. Flores-Ortega, 528 U.S. 470, 481, 120 S. Ct. 1029, 1037 (2000)). This recognizes that "[t]o uphold a lawyer's strategy, a court 'need not attempt to divine the lawyer's mental processes underlying the strategy," but instead must simply determine whether the course actually taken by counsel might have been reasonable. Id. (quoting Chandler, 218 F.3d at 1315 n.16).

Despite our reluctance to adopt absolute rules concerning what an attorney must do during the penalty phase of a trial in order to be effective, both the Supreme Court and this Court have recognized that the circumstances of a particular case may require counsel to investigate and present certain mitigating

53

evidence. This is because "[t]he purpose of a sentencing hearing is to provide the jury with the information necessary for it to render an 'individualized sentencing determination . . . [based upon] the character and record of the individualized offender and the circumstances of the particular offense.'" Dobbs v. Turpin, 142 F.3d 1383, 1386-87 (11th Cir. 1998) (quoting Penry v. Lynaugh, 492 U.S. 302, 316, 109 S. Ct. 2934, 2945 (1989)).

Most recently in Williams, the Supreme Court held that a defense attorney was ineffective in his preparation for and performance during the penalty phase of a death penalty case. See Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000).[2] The Supreme Court described the approach taken by the lawyer in that case as follows:

> The evidence offered by Williams' trial counsel at the sentencing hearing consisted of the testimony of Williams' mother, two neighbors, and a taped excerpt from a statement by a psychiatrist. One of the neighbors had not been previously interviewed by defense

---

[2]The Supreme Court's opinion in Williams did not come out until after Crawford's habeas proceedings in the Georgia courts were complete, and it consequently cannot be considered itself as clearly established federal law for purposes of determining the applicability of AEDPA's § 2254(d)(1) bar. See Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001) (noting that we must look to the relevant Supreme Court opinions of the time of the state court's decision in deciding whether § 2254(d)(1) bars our review). Nonetheless, we find the Williams decision helpful and relevant to the extent that it reveals the proper application of previous Supreme Court precedent concerning claims of ineffective assistance of counsel during the penalty phase of a capital case.

counsel, but was noticed by counsel in the audience during the proceedings and asked to testify on the spot. The three witnesses briefly described Williams as a "nice boy" and not a violent person. The recorded psychiatrist's testimony did little more than relate Williams' statement during an examination that in the course of one of his earlier robberies, he had removed the bullets from a gun so as not to injure anyone.

In his cross-examination of the prosecution witnesses, Williams' counsel repeatedly emphasized the fact that Williams had initiated the contact with the police that enabled them to solve the murder and to identify him as the perpetrator of the recent assaults, as well as the car thefts. In closing argument, Williams' counsel characterized Williams' confessional statements as "dumb," but asked the jury to give weight to the fact that he had "turned himself in, not on one crime but on four ... that the [police otherwise] would not have solved." The weight of defense counsel's closing, however, was devoted to explaining that it was difficult to find a reason why the jury should spare Williams' life.

Id. at 369, 120 S. Ct. at 1500 (citations and footnote omitted). During the state habeas proceedings in that case, however, Williams presented the following mitigating evidence that his counsel had failed to present during sentencing: "documents prepared in connection with Williams' commitment when he was 11 years old that dramatically described mistreatment, abuse, and neglect during his early childhood, as well as testimony that he was 'borderline mentally retarded,' had suffered repeated head injuries, and might have mental impairments organic in origin." Id. at 370, 120 S. Ct. at 1501. Also, evidence was presented that the State's experts who testified at sentencing concerning future dangerousness had

opined that Williams would not pose a future danger if he were kept in a "structured environment," but defense counsel failed to introduce those portions of the expert's opinions to rebut the State's future dangerousness argument. Id. at 370-71, 120 S. Ct. at 1501.

After concluding that AEDPA's § 2254(d)(1) bar was inapplicable because the Virginia Supreme Court had applied the wrong legal standard in reviewing Williams' claims, the Supreme Court held that Williams' attorney had been ineffective during the sentencing hearing. Id. at 391-399, 120 S. Ct. at 1512-16. In reaching this conclusion, the Court noted that "it is undisputed that Williams had a right – indeed, a constitutionally protected right – to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." Id. at 393, 120 S. Ct. at 1513. The court found that the counsel's performance was lacking in many respects, including:

> The record establishes that counsel did not begin to prepare for that phase of the proceeding until a week before the trial. They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records. Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison,

56

had been returned to his parents' custody.

> Counsel failed to introduce available evidence that Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school. They failed to seek prison records recording Williams' commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, or the testimony of prison officials who described Williams as among the inmates "least likely to act in a violent, dangerous or provocative way." Counsel failed even to return the phone call of a certified public accountant who had offered to testify that he had visited Williams frequently when Williams was incarcerated as part of a prison ministry program, that Williams "seemed to thrive in a more regimented and structured environment," and that Williams was proud of the carpentry degree he earned while in prison.

Id. at 395-96, 120 S. Ct. at 1514 (footnote omitted). In finding counsel's performance to be deficient, the Supreme Court found that it did not matter in that case that some of the additional evidence was unfavorable to Williams because "the failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession." Id. at 396, 120 S. Ct. at 1514. The Court noted that the omissions by Williams' trial counsel "demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." Id. at 396, 120 S. Ct. at 1514-15. After then determining that the deficiencies in Williams' counsel's performance prejudiced him, the Court concluded that Williams was entitled to habeas relief.

57

Likewise, on several occasions we have found counsel's performance during the penalty phase of death penalty cases to be deficient. For example, in Dobbs v. Turpin, 142 F.3d 1383 (11th Cir. 1998), we concluded that defense counsel's performance was deficient where the attorney failed to investigate the background or present any mitigating evidence concerning a capital defendant. Id. at 1387. We noted that an attorney in a death penalty case is obligated "to conduct a reasonable investigation, including a reasonable investigation of the defendant's background, for purposes of mitigating evidence." Id. (citations and quotations omitted). Although we recognized that "under some circumstances an attorney may make a strategic choice not to conduct a particular investigation," we also noted that "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 1388-89 (citations and quotations omitted). Under the circumstances of that case, we found that there was no good reason for the attorney not to have investigated and presented the substantial mitigating evidence that was available. Id. at 1388. We also noted that in order to receive deference, "strategic decisions . . . must flow from an informed decision." Id. (citations and quotations omitted). We stated that "[t]his circuit 'rejects the notion that a 'strategic' decision can be reasonable when the attorney

has failed to investigate his options and make a reasonable choice between them.'" <u>Id.</u> (citations and quotations omitted).

We have reached similar conclusions in several other cases. <u>See</u>, <u>e.g.</u>, <u>Fortenberry v. Haley</u>, 297 F.3d 1213, 1229-30 (11th Cir. 2002) (holding that failure to investigate and discover mitigating evidence about defendant's psychological problems, alcoholism and good character was deficient performance, and noting that "[a]bsent any viable strategic reason, however, the failure to present available mitigating evidence renders assistance constitutionally ineffective"); <u>Collier v. Turpin</u>, 177 F.3d 1184, 1201-02 (11th Cir. 1999) (holding that performance during penalty phase was deficient despite adequate investigation where the presentation of mitigating evidence is wholly inadequate and amounts to nothing more than "an empty shell of the testimony necessary" for the jury to make an individualized determination concerning the proper sentence for the defendant); <u>Blanco v. Singletary</u>, 943 F.2d 1477 (11th Cir. 1991) (holding that an attorney's performance was deficient where he failed to prepare for the penalty phase until after the defendant's conviction, and then failed to present any mitigating evidence); <u>Cunningham v. Zant</u>, 928 F.2d 1006, 1018 (11th Cir. 1991) ("[W]e find that, in light of the ready availability of this evidence and in the absence of a tactical justification for its exclusion, the failure by trial counsel to present and

argue during the penalty phase any evidence regarding Cunningham's mental retardation, combined with their failure to present and argue readily available additional evidence regarding Cunningham's head injury, his socioeconomic background, or his reputation as a good father and worker, fell outside the range of professionally competent assistance."); Harris v. Dugger, 874 F.2d 756, 759-60 (11th Cir. 1989) (holding that performance deficient where defense counsel had performed essentially no investigation related to mitigation prior to the defendant's conviction and efforts to discover such evidence during a subsequent 3-day continuance were ineffectual where approach was result of neglect and not informed decision).

It was within this legal framework that the state habeas court was called on to determine whether Siemon's performance during the penalty phase of trial was deficient, and that court determined that counsel performed adequately. Of course, that is an adjudication to which we must defer, unless it was an "unreasonable application" of relevant Supreme Court precedent. See 28 U.S.C. § 2254(d)(1). After a thorough review of the record, including both the performance of Crawford's attorney at trial and the available, but undiscovered or unused, mitigating evidence, we believe that it is a very close question whether the state court could reasonably conclude that Siemon's performance was not deficient. It is

clear that a considerable amount of mitigating evidence concerning Crawford's background and condition was available to counsel, but Siemon failed to investigate and present much of that evidence to the jury. In particular, we are troubled by the fact that counsel chose not to investigate or present that mitigating evidence, even though the evidence would have in no way been inconsistent with, or undermined, the approach taken by Siemon of focusing on Crawford's family.

The state habeas court found that Siemon deliberately chose the approach of focusing on Crawford's family during the penalty phase, and we have to defer to that finding of fact because there is support for it in the record and Crawford has not rebutted the finding by clear and convincing evidence. See 28 U.S.C. § 2254(d)(2) & (e)(1). However, even though Siemon deliberately chose to forego investigating the mitigating evidence that he informed the trial court would be important and instead expended his time and resources pursuing other approaches, that does not necessarily end the inquiry. As the Supreme Court recognized in Strickland and as we stated in Dobbs, Harris and other cases, counsel's strategic choices are only entitled to deference to the extent that they are based on an informed decision.

Here, our meticulous review of this record persuades us that there is some reason to doubt whether the choice made by Siemon not to investigate or pursue

61

mitigating evidence was based on an informed decision or was reasonable under the circumstances.  On several occasions, Siemon informed the trial court that he felt particularly unprepared to handle the penalty portion of the trial if it went that far.  Siemon indicated to the trial court that he needed more time, and additional money, to prepare for the penalty phase, in large part because he hoped to have Crawford examined by a medical doctor who could testify about his alcoholism and the effects of alcohol abuse.  It was only after the court denied Siemon's request for a continuance and for additional funds that Siemon reverted to the approach he employed during the penalty phase of focusing on Crawford's family.  Therefore, even if the approach taken by Siemon was deliberate or strategic, it may be that Siemon's choice of strategy was forced by the unreasonable time and monetary constraints that resulted from Siemon's own neglect in waiting so late to begin preparing for trial and lack of diligence in timely seeking funds from the court.  Moreover, considering the evidence concerning the minimal or superficial nature of Siemon's investigation of possible mitigating evidence, we have some doubts whether Siemon's choice of strategies was "informed."

In considering the adequacy of counsel's performance, we  view the totality of the attorney's actions and omissions and determine whether, under the circumstances, any other objectively reasonable lawyer might have taken the

approach he actually took.  See Chandler, 218 F.3d at 1315-16 ("[B]ecause counsel's conduct is presumed reasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.").  In performing this task, we are not required to focus solely on the evidence and argument that Siemon presented during the penalty phase, but instead we are to consider the totality of the circumstances surrounding his representation in light of the circumstances presented by the case.  Williams, 529 U.S. at 397, 120 S. Ct. at 1515.

The facts surrounding Siemon's representation of Crawford, as recounted in detail above, reveal that, with the exception of reading the transcript from the first trial at the time that he was retained over a year before the retrial, Siemon did not begin to prepare for the trial until two weeks before it started – even though the trial court issued its initial scheduling order three months earlier, and its amended scheduling order several weeks earlier.  In his preparations, Siemon failed to consult with, or review the file of, one of Crawford's attorneys from his first trial, and Siemon did not take the attorney up on her offer of free assistance.  At the time that Siemon began preparing, and after receiving $1000 from the trial court, he employed an investigator to look into issues concerning the jury array and to investigate other potential suspects.  A week later, on January 19, after he informed

the court that he had used up the $1000 and needed additional funds, the court indicated a willingness to consider granting more funds if Siemon documented that the initial $1000 had been used. Despite this statement from the court, Siemon did nothing to document his use of the initially granted funds, or to request additional funds, until the first day of the trial a week later.

After reviewing the transcript from the first trial once again, Siemon indicated that he was fairly well prepared to proceed with the guilt-innocence phase of Crawford's trial – assuming it stayed true to the script provided by the earlier trial – but would need additional time and resources to prepare for any penalty phase. In particular, based on his reading of the transcript of the first trial, he indicated to the court that the issue of Crawford's alcoholism and associated blackouts, and the issue of Crawford's experience in Vietnam were significant issues which he would need to develop and present in mitigation, and that he would need the assistance of experts in doing so. Siemon stated to the court:

> It would be my intention, and this clearly is one of the reasons why we've got to have an ex parte hearing on this type of thing – but it would be my intention to – if this case goes as far as penalty, to put up people from Mr. Crawford's family, to talk about his personality and how his personality may have changed since he returned from Vietnam, also, expert testimony on the effects of alcoholism and how that might mitigate – or what his state of mind might have been, if in fact – if we assume that he's committed the crime, which for the purpose of the sentencing hearing I would do, if he had been convicted.

64

Of course, the types of evidence Siemon described during this colloquy would not have been inconsistent with or undermined the approach ultimately taken of focusing on Crawford's family. It was at the time of this presentation, just before opening arguments in the case, that the court granted Siemon an additional $1000 to use however he saw fit.

Two days later while the jury was deliberating on the guilt-innocence phase – and the evening before the penalty phase began – Siemon indicated to the court that he remained unprepared and needed a continuance in order to prepare witnesses and obtain expert witnesses related to the issues that he had previously determined would be important in a mitigation case. After the trial court denied the motion for a continuance and the jury returned a guilty verdict that night, Siemon had to go forward with the mitigation case the following morning. Therefore, the record reflects that aside from reading the transcript of the first trial, several conversations with Crawford, and some "superficial" conversations with some of Crawford's family members, Siemon devoted little time to preparing mitigating evidence before the beginning of the penalty phase.

Despite his earlier statements to the court concerning the issues that would be important in mitigation, the fact that those issues were not inconsistent with the approach ultimately taken, and the court's grant of additional funds to pursue those

or other avenues, it is clear that Siemon did not pursue the mitigation issues which he had informed the court would be central to the penalty phase of the case. Instead, the evidence he presented was limited to calling several of Crawford's relatives to testify concerning their relations to Crawford and, in some cases, their desire that the jury not sentence Crawford to death. In preparation for this stage, Siemon had only "superficial" discussions with these family members, in addition to several discussions with Crawford. Siemon did not obtain or review Crawford's military or mental health care records, nor did he have Crawford examined by any medical doctors, psychiatrists, or other experts. Even after the court specifically granted Siemon funds to bring in a friend who served with Crawford in the military, Siemon did not do so. Siemon reiterated repeatedly to the habeas court that the basis for this changed approach was due to the lack of time and money that he had to prepare for the penalty phase.

Moreover, when presenting the few witnesses who did testify, Siemon's examination was minimal and did not delve into issues such as Crawford's unfortunate, abusive childhood or changes to Crawford's personality as a result of serving in Vietnam. Nor did Siemon present any other evidence concerning Crawford's experience in Vietnam, his resulting personality change, his alcoholism, or the effects of his military experience and alcohol abuse on his

mental condition. This is even though several of the witnesses who testified for Crawford had knowledge of many or all of these issues and were willing to testify about those issues, and even though such information was in no way inconsistent with asking the jury to have mercy on Crawford's family. Moreover, Siemon explained his focus on Crawford's family by suggesting to the jury that Crawford himself was not worthy of mercy and that the family members had nothing good to say about Crawford.

Despite our concerns over Siemon's performance, we have to bear in mind the narrow scope of our review. The question before us is not whether we would find that Siemon's performance was deficient if we were to decide that issue in the first instance. Instead the question is whether the state court unreasonably applied Strickland and its progeny in concluding that some objectively reasonably lawyer could have taken the approach Siemon took under the circumstances of this case. As we shall explain below, however, we conclude that Crawford failed to satisfy the prejudice prong of the Strickland standard. Therefore, because that conclusion is enough to resolve the claim before us, we need not and do not decide whether the state court acted unreasonably by concluding that Siemon's preparation for and performance during the penalty phase of trial was adequate.

b. The Prejudice Prong of the Strickland Analysis

Even if we were to find that the state court acted unreasonably in not holding that Siemon's performance during the penalty phase was deficient, we must still consider whether Crawford has shown that he was prejudiced – i.e. that there is a reasonable probability that but for his counsel's deficient performance, the result of the penalty proceedings would have been different. Strickland, 466 U.S. at 694, 104 S. Ct. at 2052. Unless Crawford can demonstrate such a "reasonable probability," he is not entitled to relief. See, e.g., Fortenberry, 297 F.3d at 1227. The state habeas court concluded that Crawford could not satisfy the prejudice prong of the Strickland test, stating: "[C]onsidering the facts of this case, it is doubtful that the evidence would cause the jury to sentence petitioner to life rather than death." State Habeas Order, at p.12.[3] Although our consideration of the totality of the aggravating and mitigating evidence, including the additional

---

[3]The state habeas court explicitly addressed the prejudice prong only with respect to part of Crawford's ineffective assistance of counsel claim – i.e., the failure to procure funds for a mental health expert to assess the significance of Crawford's PTSD, alcoholism and drug abuse. Because it is clear that a mental health expert's assessment of the significance of such disorders could constitute the strongest potential mitigating evidence, we believe that the state habeas court also implicitly found a failure to satisfy the prejudice prong with respect to the overall claim, encompassing the closely related evidence of disadvantaged upbringing. In this case, however, we need not decide whether it is proper to parse a state court's finding so finely; we have assessed the prejudice prong pursuant to both standards, AEDPA's unreasonable application standard and the unadorned Strickland standard, and under either standard, we conclude that Crawford has failed to satisfy the prejudice prong.

68

mitigating evidence adduced at the state habeas hearing, persuades us that the prejudice prong also presents a close question in this case, we ultimately conclude that Crawford has not established that any deficient performance by his attorney prejudiced him, and that the state habeas court did not unreasonably apply Strickland in so holding.

Despite any questions we may have concerning the adequacy of Crawford's counsel's performance during the penalty phase, we conclude that Crawford failed to establish the necessary prejudice to be entitled to relief from his death sentence. In reaching this conclusion, we are influenced by the strength of the evidence both of Crawford's guilt and of the aggravating circumstances relied upon by the prosecution. See Williams, 529 U.S. at 398, 120 S. Ct. at 1515 (noting that it is proper for court to consider "the strength of the prosecution evidence supporting the future dangerousness aggravating circumstance"). In this case, the jury found three aggravating circumstances: that the murder occurred during a kidnapping with bodily injury; that the murder occurred in the course of a rape; and that the murder was wantonly vile, horrible or inhumane, in that it involved torture, depravity of mind or an aggravated battery to the victim. Moreover, the facts of the case were particularly abhorrent – that Crawford raped and murdered his 29-month-old niece in order to "get even" with his sister-in-law for rejecting his

sexual advances. None of the mitigating evidence that might have been presented would have detracted significantly from these strong aggravating circumstances or from the gruesome crime of which the jury found Crawford guilty.

Crawford argues that the jury should have been informed about his experiences in Vietnam, and the effect of those experiences on Crawford's subsequent life. Although mitigating evidence concerning a defendant's combat experiences while in the military may be significant, see Jackson v. Dugger, 931 F.2d 712, 717-18 (11th Cir. 1991), the evidence presented by Crawford during his state habeas proceedings provided little insight into his combat experiences in Vietnam. Moreover, the mitigating value of this evidence is weakened because its introduction might have allowed the prosecution to present evidence that Crawford went AWOL while serving in the military after returning from Vietnam.

Crawford also relies heavily on the allegedly mitigating evidence concerning his alcohol abuse after returning from Vietnam. But, as we have previously recognized when considering such claims concerning evidence of alcohol or drug abuse, such evidence often has little mitigating value and can do as much or more harm than good in the eyes of the jury. See Housel v. Head, 238 F.3d 1289, 1296 (11th Cir. 2001) ("Evidence of drug and alcohol abuse is 'a two-edged sword,' . . . and a lawyer may reasonably decide that it could hurt as much as help the

70

defense."). Therefore, we are not persuaded that the alcohol abuse evidence that Siemon was allegedly concerned with presenting would have done much to make Crawford sympathetic to the jury.

With respect to the evidence presented by Crawford from the mental health expert – opining that Crawford suffered from PTSD and describing some common effects of that condition – the evidence from that witness at the state habeas proceeding did nothing to show that PTSD or any other mental impairment had any causal connection with Crawford's actions on the night of the crime. We cannot conclude that Crawford has shown that the proffered testimony from the mental health expert would have provided any substantial mitigation, in light of the aggravating factors involved in this case.[4]

As for the remaining mitigating evidence concerning Crawford's alcoholic father and disadvantaged childhood, while such evidence would have been mitigating, we conclude that there is no reasonable probability that it would have

_____

[4]Although it may well be true that the Vietnam experience and resulting PTSD might in some cases serve to explain and tend to excuse subsequent alcohol abuse and/or aggressive actions, the evidence adduced by Crawford in the state habeas court did no more than present a vague suggestion in this direction. Although he diagnosed Crawford with PTSD, Dr. Price expressed no opinion that PTSD caused or contributed to Crawford's actions in this case; the closest he came was a suggestion that sporadic aggressive behavior is among the features sometimes associated with PTSD.

convinced the jury to impose life rather than death in light of the extremely aggravated nature of the crime involved.

Finally, we note that Crawford relies heavily on the jury's question to the judge during its deliberations about the availability of a sentence of life without parole. While it is true that this question might reveal that the jury was not invariably set on sentencing Crawford to death, the most plausible interpretation is that the jury was concerned about Crawford's future dangerousness, and the available mitigating evidence would have done nothing to alleviate this concern. Indeed, the most likely effect of testimony that Crawford suffered from PTSD, conducive to alcohol abuse and aggressive behavior, would have been to exacerbate the jury's concern about future dangerousness.

Therefore, in light of all of the circumstances of this case, we conclude that Crawford has not shown that there is a reasonable probability that the jury would have sentenced him to life rather than death, but for the deficiencies in his counsel's performance during the penalty phase of his trial. Thus, there has been no unreasonable application of <u>Strickland</u>, and Crawford is not entitled to habeas relief from his sentence on this ground.

B. <u>Brady Claim</u>

Next, we turn to Crawford's claim that he is entitled to relief from his

conviction because the prosecution failed to provide him with exculpatory evidence as required by Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). This claim is based on a GBI report that Crawford obtained during his state habeas proceedings pursuant to the Georgia Open Records Act, O.C.G.A. § 50-18-70, et seq. This report concerned a search performed at Raymond Fuller's home – the home from which the victim was taken – following the crime.[5] This report indicated that the GBI searched the house on September 27, 1983, and that the agents discovered that "[t]here were stains from an unknown origin on the mattress covering" found in the room from which the victim was taken, and that "[a] baby blanket was also found in the bathroom adjacent to" the bedroom. The report

[5]Crawford also argues to us that the prosecution violated Brady when it failed to produce a transcript from the GBI's first interview of Raymond Fuller. In that interview, Fuller made no mention of seeing Crawford walk through the house using a lighter in the middle of the night, even though he later testified at trial to that effect. Crawford's claim based on this interview transcript is barred, however, because he did not include it as part of his Brady claim presented to the state habeas court, and Crawford has presented no cause or prejudice to excuse his default. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 112 S. Ct. 1715 (1992). Moreover, even if we considered this evidence, we would find that it would provide no basis for relief because Fuller's trial testimony was consistent with Crawford's own statement to the police that he walked though the house in the middle of the night, although he stated that he did so while looking for his wife. The testimony was also corroborated by the testimony of Charles Durham, who said that he saw Crawford drive into Fuller's yard and enter Fuller's house at some time after 3:25 a.m., and then saw the car drive away shortly thereafter. Therefore, we will limit our review of Crawford's Brady claim to those aspects concerning the GBI report regarding the search of the Fuller house.

73

indicated that this "blanket appeared to have stains of an unknown origin that could have been blood." Furthermore, the report stated that the investigators found "stains that appear to be blood of recent origin on the sheet and mattress covering" found in the bedroom, and that the investigators took a sample of the stain. Finally, the report indicated that the agents "discovered a pair of men's trousers with numerous dark stains, dirt, and fiber of an unknown origin on said trousers, in a garbage can in the kitchen."

On July 30, 1992, the day before the evidentiary hearing in the state habeas court, Crawford filed a motion with the court seeking to have produced any test results concerning the items mentioned in the GBI report or, in the alternative, to have independent testing performed on the items. At the beginning of the hearing on the next day, the court considered this motion, along with Crawford's motion for a continuance in order to permit additional psychological testing and a motion to have the some of the evidence from trial subjected to DNA testing. After hearing the parties' arguments, the court denied Crawford's motion for a continuance to allow further testing, stating:

> I'll deny the motion for a continuance. This case has been pending for two years. You've had plenty of opportunity to have your evaluations done. So I will deny the motion for a continuance . . .

Without explanation, but presumably also because of the timeliness issue, the

habeas court also denied Crawford's motion for the production of test results and for independent testing of the alleged Brady material.

In its order denying Crawford state habeas relief, the court rejected Crawford's Brady claim and held both that the claim was procedurally defaulted and that it failed on the merits. The court stated:

> Considering the facts of this case, this court finds that the GBI report is not exculpatory. In no way does it indicate that another person committed the crime and it does not create a reasonable doubt of guilt that did not otherwise exist. Harvey v. State, 262 Ga. 667 (1993). Accordingly, this court concludes that the State did not suppress evidence favorable to the petitioner.
>
> Also this court finds that this claim is procedurally defaulted under O.C.G.A. § Section 9-14-48(d) because the issue was not presented to the trial court or raised on appeal. Black v. Hardin, 255 Ga. 793 (1985); Valenzuela v. Newsome, 253 Ga. 793 (1985). The petitioner has failed to show adequate cause for failure to pursue the issue on appeal and there is not [sic] showing of actual prejudice to the accused.

State Habeas Order, at p. 2.

Afterwards, Crawford filed his federal habeas petition in April 1997, and thereafter, on August 11, 1997, he filed a motion with the district court to permit discovery concerning the results of any tests performed on the items taken from Fuller's house during the GBI search, and to permit independent experts to test the items. The district court conducted an evidentiary hearing on March 31, 1999, in which it heard arguments and evidence concerning the motion for discovery and

75

for testing of the alleged <u>Brady</u> material.  At that hearing, a witness from the GBI informed the court that the State had not performed any testing on the items taken from the Fuller house.  On May 19, 1999, at the same time that he dismissed Crawford's <u>Brady</u> claim with prejudice, the court denied the motion to have testing performed on the alleged <u>Brady</u> material, stating:

> Petitioner contends that further scientific testing on the samples of evidence recovered from the Fuller residence is necessary in order for him to be able to adequately argue his <u>Brady</u> claim.  The Court disagrees.  First, a <u>Brady</u> claim must be judged by the state of the evidence at the time the evidence is requested.  However, even if technological advances which allow further or different testing of evidence are considered, and even accepting Petitioner's hypothesis as to what this testing would show, the evidence in this case would not meet the standard for materiality of a <u>Brady</u> claim.  As noted above, the present case is far from the situation where the developments in DNA testing could prove Petitioner's innocence.  The requested evidence here would merely allow trial counsel additional arguments as to whether the state met its burden.  In any event, this Court is barred from considering the <u>Brady</u> request.

In reaching this conclusion and in dismissing the claim, the district court stated that the alleged <u>Brady</u> material only would have permitted Crawford to argue that other suspects might have committed the crime.  In light of the strong evidence of Crawford's guilt, however, the court held that there was no reasonable probability that the <u>Brady</u> material would have changed the outcome of the trial, and likewise there was no prejudice to excuse Crawford's procedural default of the claim.

In reviewing Crawford's claim, we must again consider whether the

standards imposed by AEDPA require that we defer to the state court's rejection of Crawford's <u>Brady</u> claim. Given that the state court rejected the claim both on the merits (in light of its finding that the GBI report was not exculpatory) and on the basis of a procedural default (in light of its finding that Crawford showed no cause for not raising the issue earlier), we must consider whether either of these grounds is reasonable and entitled to deference pursuant to § 2254(d)(1). As we shall explain, we conclude that neither of the state court's reasons for rejecting the claim is adequate, and therefore we are not required to defer to these rulings. However, based on our independent review, we conclude that Crawford failed to show the prejudice and materiality required to excuse his procedural default and prevail on the merits.

The federal law applicable to Crawford's claim derives from <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194 (1963), and its progeny. In <u>Brady</u>, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87, 83 S. Ct. at 1196-97. By the time of Crawford's second trial, the Supreme Court had explained the operation of the <u>Brady</u> rule in its decision in <u>United States v. Bagley</u>. 473 U.S. 667, 105 S. Ct. 3375 (1985). In

Bagley, the Court explained that pursuant to Brady, "the prosecution is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial," Id. at 675, 105 S. Ct. at 3380 (footnote omitted). This means that there is no violation unless the suppressed material "is of sufficient significance to result in the denial of the defendant's right to a fair trial." Id. at 675-76, 105 S. Ct. 3380 (quoting United States v. Agurs, 427 U.S. 97, 108, 96 S. Ct. 2392, 2399 (1976)).

The Bagley Court recognized that "evidence favorable to an accused," Brady, 373 U.S. at 87, 83 S. Ct. at 1196, is not limited to evidence that proves the defendant did not commit the crime. Bagley, 473 U.S. at 676, 105 S. Ct. at 3380. Instead, "[i]mpeachment evidence . . . as well as exculpatory evidence, falls within the Brady rule" because, "if disclosed and used effectively, it may make the difference between conviction and acquittal." Id.

In Bagley, the Supreme Court recognized that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial," and then proceeded "to determine the standard of materiality applicable" to undisclosed Brady material. Id. at 678, 105 S. Ct. at 3381. After discussing its former cases which applied different materiality standards depending on the specificity of the

78

defendants' requests for disclosure, the Court determined that one, flexible standard, borrowed from Strickland, should be employed in all contexts.  Id. at 378-82, 105 S. Ct. at 3381-83.  That is:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

Id. at 682, 105 S. Ct. at 3383.

In Kyles v. Whitley, 514 U.S. 419, 115 S. Ct. 1555 (1995),[6] the Supreme Court again addressed the application of Brady and its progeny, and it highlighted four important aspects of the materiality inquiry established by Bagley, stating:

> Four aspects of materiality under Bagley bear emphasis.  Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). . . . Bagley's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy

_____

[6]Although Kyles came out after the Georgia state courts had adjudicated Crawford's Brady claim, and it consequently cannot itself be the basis for clearly established federal law when making the § 2254(d)(1) determination, its discussion of previous Supreme Court cases that were in existence when the state courts adjudicated this claim is clearly relevant in this regard.

of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

Third, we note that . . . once a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review. Assuming, arguendo, that a harmless-error enquiry were to apply, a Bagley error could not be treated as harmless, since "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the jury's verdict. . . .

The fourth and final aspect of Bagley materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item.

Kyles, 434-36, 115 S. Ct. at 1565-67 (citations, quotations and footnotes omitted).

In light of this clearly established federal law, as set out in the Supreme

Court's decisions, it is apparent that the state habeas court applied a standard that

was "contrary to" federal law when it considered Crawford's Brady claim. See 28

U.S.C. § 2254(d)(1). In its opinion, the state court found that Crawford's claim

80

lacked merit because the GBI report "is not exculpatory" and because "[i]n no way does it indicate that another person committed the crime and it does not create a reasonable doubt of guilt that did not otherwise exist." State Habeas Order, at p. 2. The only case cited as support by the state habeas court is Harvey v. State, 424 S.E.2d 619 (Ga. 1993), in which the Georgia Supreme Court rejected a Brady claim because the undisclosed, exculpatory material failed to "create[] a reasonable doubt of guilt that did not otherwise exist." Id. at 620 (citing United States v. Agurs, 427 U.S. 97, 96 S. Ct. 2392 (1976)). Both the Harvey court and the state habeas court in this case failed to recognize that the Supreme Court altered the materiality standard in Bagley, as discussed above, and adopted a standard requiring only a "reasonable probability" of a different outcome if the material had been disclosed. See Bagley, 473 U.S. at 682, 105 S. Ct. at 3383.

Therefore, the state court's decision in this regard is not entitled to deference pursuant to § 2254(d)(1) because it was contrary to, and/or involved an unreasonable application of, well-established Supreme Court precedent that existed at the time.

Even though we hold that the state court's decision on the merits is not entitled to deference under § 2254(d)(1), we must consider the alternative basis for the state habeas court's decision – that the Brady claim was procedurally defaulted

81

and that Crawford "failed to show adequate cause for failure to pursue the issue on appeal and there is no showing of actual prejudice to the accused" – before we review the claim <u>de novo</u>. The Supreme Court has recognized that "if it fairly appears that the state court rested its decision primarily on federal law, this Court may reach the federal question on review unless the state court's opinion contains a 'plain statement' that [its] decision rests upon adequate and independent state grounds." <u>Harris v. Reed</u>, 489 U.S. 255, 261, 109 S. Ct. 1038, 1042 (1989) (citations and quotations omitted). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." <u>Id.</u> at 263, 109 S. Ct. at 1043 (citations and quotations omitted).

It is clear that the state court based its decision on both its view of the merits of Crawford's claim, and on the independent basis that the claim was procedurally defaulted. Therefore, we can only review his <u>Brady</u> claim if he "can show 'cause' for the default and 'prejudice attributable thereto' . . . or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" <u>Id.</u> at 262, 109 S. Ct. at 1043 (citations omitted). "To establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the

82

defense impeded the effort to raise the claim properly in the state court." Wright v. Hopper, 169 F.3d 695, 703 (11th Cir. 1999). "In order to establish prejudice, [a petitioner] must show that the items of evidence were material; that is, that 'had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. (citation omitted). "In order to show the type of 'miscarriage of justice' that will excuse a procedural bar, a petitioner must make a colorable showing of actual innocence." Isaacs v. Head, 300 F.3d 1232, 1255 (11th Cir. 2002) (citation and quotations omitted).

Contrary to the state court's conclusion, we believe that Crawford has adequately shown cause to excuse any procedural default. Crawford established that despite requests from defense counsel, the State was in possession of the alleged Brady material, but failed to disclose it. Moreover, in interpreting the Georgia Open Records Act, the Georgia Supreme Court has held that "once the trial has been held, the conviction affirmed on direct appeal, and any petition or petitions for certiorari denied (including to the Supreme Court of the United States), the investigatory file in [a criminal] case should be made available for public inspection." See Napper v. Georgia Television Co., 356 S.E.2d 640, 647 (Ga. 1987). Because Crawford could not have requested and received the GBI report until the time of his post-conviction proceedings, he has shown "cause" to

83

excuse any procedural bar.   See <u>Strickler v. Greene</u>, 527 U.S. 263, 289, 119 S. Ct.

1936, 1952 (1999) (finding cause to excuse procedural default where prosecution

did not disclose material or include it in its file, where prosecutor had open file

policy on which defendant relied, and where asserting claim in state court would

have been based on "mere speculation").

Next, we must whether Crawford has also demonstrated sufficient prejudice

to excuse his default of the claim.  In determining whether sufficient prejudice has

been shown to excuse the default of a <u>Brady</u> claim, both the Supreme Court and

this Court have conflated to a large extent the prejudice inquiry with the materiality

standard required to obtain relief under <u>Brady</u>.   See <u>Strickler</u>, 527 U.S. at 289, 119

S. Ct. at 1952; <u>Wright</u>, 169 F.3d at 703-04.  While neither Court appears to have

gone so far as to say that the inquiries are identical, the Supreme Court in <u>Strickler</u>

noted that in order to show prejudice, a petitioner "must convince us that 'there is a

reasonable probability' that the result of the trial would have been different if the

suppressed documents had been disclosed to the defense."  <u>Strickler</u>, 527 U.S. at

289, 119 S. Ct. at 1952.  Likewise, in <u>Wright</u>, in the context of determining

whether a petitioner had shown prejudice, we considered whether the undisclosed

evidence would establish such a "reasonable probability" of a different outcome.

<u>Wright</u>, 169 F.3d at 703-04.  Therefore, it seems that in practice the inquiries are

84

the same.  At the very least, however, these cases show that "prejudice" cannot be established where the Brady materiality standard is not satisfied.  For purposes of deciding this case, as we shall explain, Crawford has not established the "reasonable probability" of a different outcome necessary to prove a Brady violation, so we have no occasion to determine whether the requisite "reasonable probability" could ever exist without the prejudice prong also being satisfied.

In considering whether the undisclosed GBI report creates a reasonable probability that Crawford's trial would have had a different outcome, it becomes relevant to consider both the state habeas court's and the district court's denial of Crawford's requests to perform tests on the items mentioned in the report because those decisions affected the value and content of the alleged Brady material as well as the strength of Crawford's showing of materiality.[7]

First, we consider the state habeas court's denial of Crawford's motion to allow testing on the items mentioned in the GBI report.  As discussed above, even

_____

[7]We note that it does not appear that Crawford requested to have DNA testing performed on the items mentioned in the GBI report while in state court. Prior to the state evidentiary hearing, Crawford made a motion to have the results of serological tests performed on the items produced, or for independent serological testing in the event that no test results were available.  In a separate motion filed on the same day, Crawford requested permission to have DNA testing performed on the physical evidence used against him at trial, but he did not include in that motion a request to have such testing performed on the items mentioned in the GBI report.

though Crawford's state habeas case had been pending for almost 2 years, that motion only was filed on the day before the scheduled evidentiary hearing. Although the court did not explicitly state its reason for denying the motion, given that the court had denied the motion for a continuance as untimely directly before considering the motion for testing, and given that the need for a continuance was to afford time for testing, and given that the motion for a continuance was filed at the same time as the motion for testing, it is apparent that the state court also denied the motion for testing as untimely. Under the circumstances, we conclude that the court's decision to deny the motion for testing at that late date was unassailable.

Next, we consider the district court's denial of Crawford's motion to allow testing of the items mentioned in the GBI report. The Supreme Court has recognized that "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of course." Bracy v. Gramley, 520 U.S. 899, 904, 117 S. Ct. 1793, 1796-97 (1997). Rule 6(a) of the Rules Governing § 2254 Cases states:

> A party shall be entitled to invoke processes of discovery available
> under Federal Rules of Civil Procedure if, and to the extent that, the
> judge in the exercise of his discretion and for good cause shown
> grants leave to do so, but not otherwise.

In interpreting the "good cause" portions of this rule, the Supreme Court noted that "where specific allegations before the court show reason to believe that the

86

petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." Id. at 908-09, 117 S. Ct. at 1799 (citation and quotation omitted). The Supreme Court also has noted that the rules "afford the district court substantial discretion in the conduct of a case." Lonchar v. Thomas, 517 U.S. 314, 326, 116 S. Ct. 1293, 1300 (1996).

Moreover, as we recently discussed in Isaacs v. Head, 300 F.3d 1232 (11th Cir. 2002), "[i]n passing AEDPA . . . Congress modified the discretion afforded to the district court and erected additional barriers limiting a habeas petitioner's right to discovery or an evidentiary hearing." Id. at 1248-49; see 28 U.S.C. § 2254(e)(2).[8]

---

[8]Section 2254(e)(2) states:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
 (A) the claim relies on--

 (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

 (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

 (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder

87

In its decision in <u>Williams v. Taylor</u>, 529 U.S. 420, 120 S. Ct. 1479(2000), the Supreme Court interpreted § 2254(e)(2) to mean that a petitioner who "failed to develop" the factual basis for a claim while in state court as a result of the petitioner's lack of diligence is barred from doing so in federal court (subject to the very narrow exceptions set out in § 2254(e)(2)). <u>See</u> <u>id.</u> at 433-34, 120 S. Ct. at 1489. The Court held that "[d]iligence for purposes of the opening clause [of § 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of information available at the time, to investigate and pursue claims in state court." <u>Id.</u> at 435, 120 S. Ct. at 1490. After discussing the meaning of § 2254(e)(2), the Supreme Court went on to find that an evidentiary hearing was not required with respect to the claims of which Williams was on notice while in state court. <u>Id.</u> at 438-445, 120 S. Ct. at 1491-94.

Under the facts of this case, we agree with the district court that Crawford failed to exercise sufficient diligence in seeking testing of items mentioned in the GBI report while in state court. As explained above, Crawford only moved the state habeas court for permission to do so on the day before his evidentiary hearing, and the court reasonably denied that motion as untimely. Therefore, as the district court found, in light of both § 2254(e)(2) and Rule 6(a), we conclude that

would have found the applicant guilty of the underlying offense.

88

Crawford was not entitled to have the items from the GBI report tested after bringing his case in the federal courts.

Given that Crawford's requests for testing were properly rejected, we cannot consider conjecture about what testing might have shown while deciding Crawford's Brady claim. Instead, we are limited to reviewing the materiality of the GBI report, standing alone, and to determining whether the information in that report was sufficiently material such as to create a reasonable probability that the trial would have had a different outcome if it had been disclosed to the defendant at the time. We conclude that it was not.

Crawford's argument in favor of materiality centers around the fact that the information in the report draws into question the validity of the prosecution's theory of the case – that Crawford took Leslie English from the Fuller house while she was sleeping, carried her to his trailer where he raped and killed her, and then took her body and dumped it at the spot where it was found. Crawford points out that because the State had to prove its case exclusively by using circumstantial evidence, it had the burden of "exclud[ing] every other reasonable hypothesis save that of the guilt of the accused." O.C.G.A. § 24-4-6. Crawford argues that the GBI report, and in particular the discovery of possible blood stains on the bedding and baby blanket in or around the room from which the victim was taken, suggests that

the murder actually took place in the Fuller house. Crawford argues that this is significant not only because it is inconsistent with the prosecution's stated theory of the crime, but also because it would lend support to his argument that the crime was committed by one of the other individuals with access to the house who had a history of child molestation, or even that the murder was committed by the grandfather, Raymond Fuller. Crawford also argues that the evidence would undermine Raymond Fuller's credibility because, if the crime took place in the room next door to where he was sleeping, it is unlikely that he would not have been awakened by the noise. Finally, Crawford argues that the discovery of pants with dirt and stains on them found in the kitchen trash cans is evidence that points to the possibility that someone other than Crawford committed the crime, because he argues that the pants could not have been his since his pants were taken by the police.

Like the district court, given the strong evidence of Crawford's guilt, we are not persuaded that these arguments create a reasonable probability that Crawford's trial would have come out differently if the report had been disclosed. As discussed above, a substantial body of hair, fiber, and blood evidence tied together Crawford, Crawford's car, the victim, and the bedding discovered beside the road near the victim's body. And, two witnesses testified that they saw Crawford in the

house from which the victim was taken around the time that she disappeared. And, there was testimony that Crawford had threatened to "get even" with the victim's mother earlier in the night, after she refused his advances. Also, the bedding found beside the road – which had on it Crawford's head and pubic hair, the victim's head hair, blood of the same type as the victim's, and fibers from Crawford's car – was identified by Crawford's wife as coming from their trailer. And, the shirt worn by Crawford was found hidden in someone else's house, and the shirt had blood on it. Moreover, in addition to all of this incriminating evidence, Crawford stated to the police during his third interview:

> I remember having Leslie in my lap at the stop sign; I tried to wake her up, but she wouldn't talk to me; . . . I remember being on a paved road at a stop sign . . .; I think I got out of the car at the stop sign; I had Leslie in my arms; I tried to wake her up again; I remember walking on the pavement, because it was easy walking; I remember it being cold; I can't remember – I can remember it being light enough either by a streetlight or by the moon, to see my car, I was looking at my car on the driver's side 10 to 15 feet away from it with Leslie in my arms; I can't remember getting back in the car without Leslie, but I guess I did, because the next thing I remember is seeing Skip's house, and she wasn't in the car with me at Skip's house; the next thing I remember is when Wanda – the next thing I remember is Wanda waking me up in Skip's yard.

During that interview, after the police told Crawford that the victim had been raped, Crawford "stated that if he got the chance he would be with Leslie and asked [the officer] for [his] service revolver." He later told the police that he

91

remembered having the victim in his lap that night and shaking her, but she would not wake up. When Crawford was told during that interview that it had been confirmed that the victim was raped, he "responded by bending his head over in a fetal position and crying and trembling." Crawford's descriptions during his statements were consistent with the location where the victim was discovered.

It is against this overwhelming evidence that we must consider whether the GBI report created a reasonable probability that the jury would have acquitted Crawford. We conclude that the evidence and arguments that would have been available to Crawford if the report had been produced would have been speculative and weak. The existence of possible blood stains in that bedroom does nothing to prove that someone other than Crawford killed the victim. Moreover, tying the blood to the crime would be speculative and the jury would have been aware that it is common for children to bleed for lots of reasons and that the blood could have been completely unrelated to the crime. Also undermining the significance of the evidence is that the search did not occur until two days after the crime, but in the meantime, according to his own statement, Crawford had spent the night at the Fuller house, been in contact with the bedding from the room from which the victim was taken, and even changed clothes while in the Fuller house. Therefore, at most the GBI report would have would have provided Crawford with a slightly

stronger argument that the crime did not happen exactly as the prosecution described or that other potential suspects should have been more thoroughly investigated, but it does nothing to undermine the strong evidence of Crawford's guilt in the form of the physical evidence, the testimony of some of the witnesses, and Crawford's own statements.

Therefore, under these circumstances, we conclude that Crawford has not established that there is a reasonable probability that his trial would have had a different outcome if the prosecution had disclosed the GBI report in a timely manner. This means that Crawford also cannot demonstrate prejudice to excuse the procedural default on this claim. Therefore, both on the merits and because of the procedural bar, Crawford is not entitled to relief on his Brady claim.

C. Juror Misconduct Claim

Finally, we turn to Crawford's claim that he is entitled to relief from his conviction because of alleged juror misconduct. This claim is based entirely on affidavits, submitted to the state habeas court, from two of the jurors from his trial. In the first affidavit, Juror Melinda Adams, who was finishing her first year of nursing school at the time of trial, stated:

> A lot of the evidence presented at trial consisted of physical evidence like hair and blood samples. Other jurors asked me questions about the evidence and what tests and results meant. I answered what I could but told them I was only a nursing student.

93

A second juror, Howard Crowder, submitted an affidavit which stated:

> The physical evidence at trial was particularly important in helping to persuade me of Eddie Crawford's guilt. There was evidence of hair and blood samples, including body hair, fibers, and a bloody shirt stuffed behind some furniture.
>
> During our sentencing deliberations, two jurors did not want to sentence Eddie Crawford to death. One believed the hair and blood samples could have come from anyone, and did not understand that the tests done on the samples proved it was Eddie Crawford who committed the crime. This person finally understood when a nurse on the jury helped explain the scientific tests could prove the blood and hair belonged to Eddie Crawford. Hairs were found on the little girl.

Crawford argued to the state habeas court, based on these affidavits, that Juror Adams essentially became a witness whom he was unable to cross-examine, and that this constituted juror misconduct. The state habeas court rejected the juror misconduct claim on three bases, stating:

> These affidavits were not allowed into evidence at the habeas corpus hearing because "affidavits of jurors may be taken to sustain but not to impeach their verdict." O.C.G.A. § Section 17-9-41. Moreover, the affidavits are irrelevant because they do not tend to show that anything improper took place in the jury room.
>
> Nothing in the affidavits indicate [sic] that Juror Adams was relying upon her own training and experience to explain the significance of the blood and hair samples and scientific tests performed by the state. Rather, the affidavits are entirely consistent with a situation where one juror was merely reminding other jurors of the testimony and exhibits that were presented to them in court and discussing her understanding of the significance of the evidence. Petitioner has not presented any evidence to show that the events took place any other way. Besides, juries are supposed to examine the evidence in light of their own

94

backgrounds and experiences, and by relying upon their collective backgrounds and experiences, arrive at a verdict that peaks the truth. The evidence does not tend to show that Juror Adams became an unsworn witness against the petitioner.

Furthermore, this court concludes that the instant claim is procedurally defaulted pursuant to Georgia law due to the failure of the petitioner to have raised his claim both at trial an on direct appeal, and that the petitioner has failed to show both adequate cause and actual prejudice to excuse the procedural default.

State Habeas Order, at p. 19.

In support of his juror misconduct claim, Crawford relies on several Supreme Court opinions. First, Crawford points to the Supreme Court's decision in Turner v. Louisiana, 379 U.S. 466, 85 S. Ct. 546 (1965). In that case, a defendant was convicted and sentenced to death, based in large part on the testimony of two deputy sheriffs whose credibility was challenged by the defendant. Pursuant to Louisiana law, however, the jury was placed in the charge of these same two deputies during the course of the trial, during which time the deputies "ate with them, conversed with them, and did errands for them." Id. at 468, 85 S. Ct. at 547. The Court concluded that this interaction between the deputies and the jurors violated the defendant's rights, stating:

In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel. What happened

95

in this case operated to subvert these basic guarantees of trial by jury. It is to be emphasized that the testimony of [the defendants] was not confined to some uncontroverted or merely formal aspect of the case for the prosecution. On the contrary, the credibility which the jury attached to the testimony of these two key witnesses must inevitably have determined whether [the defendant] was to be sent to his death. To be sure, their credibility was assailed by Turner's counsel through cross-examination in open court. But the potentialities of what went on outside the courtroom during the three days of the trial may well have made these courtroom proceedings little more than a hollow formality.

Id. at 472-72, 85 S. Ct. 550. Therefore, the Court recognized that it may violate a defendant's rights to allow a jury's verdict to be affected by evidence or other influences external to the court proceedings.

In Remmer v. United States, 347 U.S. 227, 74 S. Ct. 450 (1954), a juror was approached by an unknown person during the course of a trial and informed that he could profit from bringing in a verdict favorable to the defendant. The juror informed the judge of this event, and the judge had the FBI investigate the issue, but concluded, without informing the defendant, that the comment was made in jest and nothing further needed to be done. Id. at 228, 74 S. Ct. at 451. The Court noted that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the

96

court made during the trial, with full knowledge of the parties." Id. at 229, 74 S.

Ct. at 451. The Court vacated the judgment and remanded for a hearing

concerning the effect of the FBI investigation on the juror, noting:

> The sending of an F.B.I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror and is very apt to do so unduly. A juror must feel free to exercise his functions without the F.B.I. or anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions.

Id.

Finally, in Smith v. Phillips, 455 U.S. 209, 102 S. Ct. 940 (1982), the

Supreme Court considered a defendant's juror misconduct claim based on the fact

that a juror at his trial submitted an employment application with the district

attorney's office during the course of the trial. After learning of the incident, the

state court held a hearing concerning the juror's actions, and held that the

defendant was not prejudiced. Id. at 213-14, 102 S. Ct. at 944. The lower federal

courts granted the defendant habeas relief, however, based on this claim, holding

that prejudice should presumed and/or that the information should have been

disclosed to the defendant during the trial by the prosecution. Id. at 214, 102 S. Ct.

at 944. The Supreme Court disagreed, holding that the hearing conducted by the

state court was sufficient to protect the defendant's rights, but stating:

> These cases demonstrate that due process does not require a new trial every time a juror has been placed in a potentially compromising

situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in Remmer and held in this case.

Id. at 217, 102 S. Ct. at 946. Therefore, while a defendant is entitled to be judged by an impartial jury based on evidence adduced at trial, not every external influence on a juror results in prejudice or entitles a defendant to relief.

In light of these cases, all of which are far removed from the facts underlying Crawford's juror misconduct claim, we conclude that the state habeas court did not act contrary to, or unreasonably apply, clearly established federal law in rejecting the instant claim. As the court noted, the affidavits submitted by Crawford do not show that any juror introduced external evidence into the jury deliberations or unduly influenced other jurors. Instead the evidence is consistent with jurors bringing their experiences to bear while reviewing the evidence properly before them. Therefore, we conclude that Crawford is not entitled to relief on his juror misconduct claim.[9]

[9]Alternatively, we conclude that the state court's disposition of the claim on procedural default grounds is entitled to deference. Even if we assume arguendo

## V.  CONCLUSION

For the foregoing reasons, we conclude that Crawford has not shown that he is entitled to relief from either his conviction or death sentence.  Therefore, the district court properly denied Crawford's habeas petition.

AFFIRMED.

---

that Crawford had "cause" for not raising this claim earlier, in light of our view of the merits of his claim discussed above in the text, he could not demonstrate "prejudice" to excuse his default.  In light of our decision that the state habeas court's ruling is entitled to deference both in light of its ruling on the merits and its procedural default ruling, we need not and do not address the third basis for its decision – the impropriety of juror affidavits impeaching a verdict.